# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELHAM SATAKI,

    Plaintiff,

    v.

BROADCASTING BOARD OF
GOVERNORS, *et al.*,

    Defendants.

Civil Action No. 10-534 (CKK)

## MEMORANDUM OPINION
(July 7, 2010)

Presently pending before the Court are Plaintiff Elham Sataki's [11] Motion for a
Preliminary Injunction[1] and Plaintiff's [41] Motion for Reconsideration of this Court's order
denying her request for a temporary restraining order. This case stems from allegations that
Plaintiff was sexually harassed and assaulted by a co-worker at the Persian News Network
("PNN") and that her employer, the Broadcasting Board of Governors ("BBG"),[2] as well as

---

[1] Plaintiff's Motion is styled as a Motion for a Temporary Restraining Order and/or
Preliminary Injunction. The Court has previously denied Plaintiff's request for a temporary
restraining order. *Sataki v. BBG*, __ F. Supp. 2d __, 2010 WL 2195799 (D.D.C. June 1, 2010).
Accordingly, only Plaintiff's request for a preliminary injunction remains pending at this time,
and the Court shall refer to Plaintiff's pending motion solely as a "Motion for a Preliminary
Injunction." In addition, the Court notes that as a result of apparent technologic difficulties
experienced by Plaintiff's counsel when filing the Motion, the original version of the Motion
filed on May 20, 2010, appears to be missing certain attachments and exhibits. *See* Docket No.
[5]. Plaintiff re-filed the Motion, along with a complete set of exhibits, on May 24, 2010. *See*
Docket No. [11]. The two motions are substantively identical. For convenience, then, all
citations to Plaintiff's Motion and exhibits in this Memorandum Opinion are to the complete
version filed on May 24, 2010. *See* Docket No. [11].

[2] The Broadcasting Board of Governors is the federal agency responsible for management
of the Persian News Network.

several members and employees of the BBG, unlawfully facilitated the alleged sexual harassment, actively attempted to cover up the incidents of harassment, interfered with the investigation of her administrative complaint, and retaliated against her for complaining about her co-worker's harassing conduct as well as for criticizing BBG's management and mission. As a result of this alleged conduct, Plaintiff claims that she has suffered both mental and physical injuries and is presently unable to continue working near or around those responsible for the alleged harassment and retaliation. Consequently, Plaintiff has not returned to work since approximately February of 2010.

Plaintiff has filed a series of administrative and legal complaints seeking review of her allegations of harassment and retaliation. She initially filed suit against her alleged harasser on March 1, 2010, in the Superior Court of the District of Columbia. That case was subsequently removed to this Court on March 19, 2010, and remains pending at this time. *See Sataki v. Falahati*, Civ. Act. No. 10-466 (CKK). Thereafter, on March 25, 2010, Plaintiff filed a complaint with BBG's Office of Civil Rights, which complaint also remains pending before the agency. Finally, on April 2, 2010, approximately one week after filing her administrative complaint, Plaintiff filed the above-captioned lawsuit. She has named as Defendants in this action BBG and several members and employees of the BBG, both in their official as well as their individual capacities ("Individual Defendants") (collectively with BBG, "Defendants"). As set forth in Plaintiff's initial complaint, she alleges that Defendants violated her constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments and failed to provide her with a reasonable

accommodation in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*[3] Plaintiff

seeks a final award of monetary damages in the form of all back pay and benefits owed to her for

the period of her absence from work as well as punitive damages and a permanent injunction

ordering BBG to permit Plaintiff to perform her work from Los Angeles, California.

Approximately one month after filing the present lawsuit, Plaintiff amended her complaint

in this matter to add a claim for interim injunctive relief pursuant to the D.C. Circuit's decision in

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987). As set forth therein, Plaintiff asks the Court to

issue interim injunctive relief awarding her monetary damages in the form of all back pay and

benefits owed to her for the period of her absence from work and a temporary restraining order

and/or preliminary injunction requiring that BBG permit Plaintiff to work from Los Angeles,

California, during the pendency of her administrative and legal proceedings. Such relief is nearly

identical to the ultimate relief requested in this lawsuit and is at the heart of the motions now

pending before the Court, in which Plaintiff seeks issuance of a preliminary injunction and also

asks the Court to reconsider its prior decision denying her motion for a temporary restraining

order. The Court has thoroughly considered Plaintiff's pending motions and the parties'

respective briefing, the relevant case law and statutory authority, and the record of this case as a

whole. Despite Plaintiff's repeated claims that she is seeking only interim injunctive relief to

preserve the status quo, it is patently clear that Plaintiff in fact seeks an order affirmatively

altering the status quo during the pendency of the administrative proceedings below. The Court's

───────────────

[3] Plaintiff has also asserted a claim under the Privacy Act of 1974, 5 U.S.C. §§ 552(a) *et seq.* The parties have agreed that this claim is not presently at issue with respect to Plaintiff's request for interim injunctive relief. Thus, while cognizant that Plaintiff has asserted a claim under the Privacy Act, that claim is not addressed in the instant Memorandum Opinion.

jurisdiction to issue such relief is far from clear. Well-established precedent further counsels that this Court should be reluctant to interfere with the personnel decisions of the federal government. Nonetheless, even if the Court were to conclude that it had the authority to issue the relief sought, Plaintiff has failed to demonstrate that the requested relief is either appropriate or warranted in this case. Accordingly, for the reasons set forth below, the Court shall DENY Plaintiff's [11] Motion for a Preliminary Injunction and shall also DENY Plaintiff's [41] Motion for Reconsideration.

## I. BACKGROUND

Much ink has been spilled with respect to Plaintiff's request for interim injunctive relief, with the result that the record now before the Court has become voluminous and, at times, unwieldy. This is largely the result of the shifting nature of Plaintiff's legal arguments and factual claims, which have necessitated several rounds of additional briefing by the parties. Ultimately, the Court finds that many of the issues raised by the parties in their present briefing are immaterial to resolution of Plaintiff's request for interim injunctive relief. Nonetheless, given the numerous factual issues raised by Plaintiff in her pending motions and her oft-repeated — although wholly inaccurate — assertions that the Court has failed to consider all evidence relevant to the pending dispute, the Court sets forth below a comprehensive discussion of the factual background of this case. The Court does so in order to ensure that the record, as well as the Court's findings with respect to those issues raised by Plaintiff, is clearly and concisely set forth and that the issues raised by Plaintiff are each addressed, either explicitly or in summary form. As many of these issues ultimately prove immaterial to the resolution of the pending motions, however, the Court has limited its legal discussion below solely to those factual and

legal issues that are directly relevant to the merits of Plaintiff's pending request for interim injunctive relief and which the Court has relied upon in denying Plaintiff's motions. With that understanding in mind, the Court turns now to its discussion of the factual background of the claims in this litigation.

A.    *Factual Background*

The Court first addresses Plaintiff's repeated requests for an evidentiary hearing on her pending Motion for a Preliminary Injunction. It is well established in this Circuit that courts have discretion to resolve a preliminary injunction motion on the basis of the parties' briefing without a hearing, when appropriate. *See* LCvR 65.1(d). Further, even when a hearing is held, "[t]he practice in this jurisdiction is to decide preliminary injunction motions without live testimony where possible." *Id.* Plaintiff nonetheless asserts that an evidentiary hearing is required so that she may present the live testimony of her treating clinical psychologist, *see* Pl.'s Notice, Docket No. [20], and so that she may cross-examine Defendants' declarants on the substance of their testimony submitted in opposition to Plaintiff's motion, *see* Pl.'s Supp. Reply at 4.

The Court has determined in its discretion, upon careful review of the parties' legal memoranda and attachments, that an evidentiary hearing is not necessary. While the parties unquestionably dispute many of the facts underlying Plaintiff's substantive claims in this action, the Court finds that none of these disputes are material to or directly affect the Court's resolution of Plaintiff's request for interim injunctive relief. As indicated below, the Court has accepted the statements of Plaintiff's treating clinical psychologist as well as her treating psychiatrist for purposes of this Memorandum Opinion. Moreover, although Plaintiff generally alleges that the declarations attached to Defendants' memoranda "must [be] treat[ed] as suspect," *see* Pl.'s Supp.

5

Reply at 4, her conclusory assertions on this point are insufficient to create a dispute of material fact absent specific evidence directly contravening the particular statements she seeks to challenge. Where Plaintiff has in fact proffered such evidence, the Court has noted as much and, where appropriate, has found for the reasons set forth below that such disputes are not material to the merits of Plaintiff's request for interim injunctive relief and therefore need neither be resolved at this time nor relied on. Where, however, Plaintiff has failed to either dispute specific statements made by Defendants or introduce any contradictory evidence into the record, the Court has accepted Defendants' statements as undisputed for purposes of this Memorandum Opinion. The Court emphasizes that no disputed facts asserted by Plaintiff and/or Defendants, material or otherwise, have been relied upon in reaching the ultimate decision below that Plaintiff is not entitled to the requested interim injunctive relief. No evidentiary hearing is therefore required.

<u>1.</u>  <u>Plaintiff's Work History at BBG</u>

The Broadcasting Board of Governors is a federal agency responsible for the U.S. Government's international broadcasting. *See Grosdidier v. Chairman, BBG*, 560 F.3d 495, 496 (D.C. Cir. 2009). It manages a network of individual broadcasting services, including the International Broadcasting Bureau, which carries out government-sponsored nonmilitary international broadcasting through the Voice of America ("VOA") and other entities. *See* 22 U.S.C. §§ 6202, 6204, 6206. The Persian News Network, which is under the VOA, provides television and radio news and information programming to an audience in Iran.

Plaintiff Elham Sataki is a GS-12 International Broadcaster for PNN. *See* Pl.'s Mot., Ex. 1 (First Declaration of Elham Sataki) (hereinafter, "First Sataki Decl."), ¶ 6; Defs.' Opp'n to Pl.'s Mot. (hereinafter, "Defs.' Opp'n"), Docket No. [30], Ex. 2 (First Declaration of Donna Grace)

(hereinafter, "First Grace Decl."), ¶ 7.  Her duty station is in Washington, D.C.  First Grace Decl. ¶ 7 & Ex. G (SF-50).  Plaintiff began working for PNN as an employee on February 19, 2008.  *See id.*, Ex. G (SF-50).  Plaintiff's responsibilities include reading news segments for the shows "News and Views" and "News Brief," which are both taped in Washington, D.C., as well as performing general assignments, which involves going into the field, conducting interviews, and creating "packages."  *See* Defs.' Opp'n, Ex. 3 (Declaration of Susan Reed Jackson) (hereinafter, "Jackson Decl."), ¶ 3.[4]  Importantly, while Plaintiff's job duties occasionally require her to perform her work duties in the field, the record indicates that Plaintiff has always been assigned to the Washington, D.C. duty station; there is no indication that Plaintiff has been detailed to any other office location nor is there any evidence that she has been permitted to work remotely from another location for any extended period of time.

Since as early as August 2009, Plaintiff has requested to be assigned to Los Angeles, California, where she resided for nearly 10 years prior to accepting her current position with PNN.  *See* Defs.' Opp'n, Ex. 6 (correspondence from Plaintiff to PNN supervisor dated August 26, 2009; January 5, 2010; and January 14, 2010); First Sataki Decl. ¶¶ 3-4.  A separate division

---

[4] While Plaintiff disputes various statements contained in the Jackson Declaration, the Court emphasizes that she has not disputed the accuracy of her job duties description provided in Ms. Jackson's declaration nor provided any evidence on the record that would create a material issue of fact as to Plaintiff's present job duties as an International Broadcaster.  Indeed, the Court observed that there was no dispute that Ms. Jackson accurately described Plaintiff's job duties in its prior Memorandum Opinion denying Plaintiff's request for a temporary restraining order, *Sataki*, 2010 WL 2195799, at *2, n. 4, and Plaintiff has not argued that this particular finding was in error.  Moreover, as explained above, Plaintiff's general assertion, made without specific evidentiary support, that Ms. Jackson, like all of Defendants' declarants, has a "reason and motive to lie," Pl.'s Supp. Reply at 4, is insufficient to create a dispute of material fact as to the accuracy of her description of Plaintiff's job duties.

of VOA — the Central News Division (which is not a part of PNN) — has a Los Angeles office that is staffed by two employees, namely, a Supervisory International Radio Broadcaster, GS-13, who serves as a correspondent, and a Program Assistant, GS-9, who produces radio and television transmissions. *See* Defs.' Opp'n, Ex. 8 (Declaration of Jack Payton) (hereinafter, "Payton Decl."), ¶ 2. PNN has occasionally used the Central News Division's studio office in Los Angeles to permit its employees in the D.C. office to remotely interview an individual in Los Angeles. *Id.* ¶ 3. In addition, PNN has three contractors located in Los Angeles, two of whom are contract video journalists and the third of whom is a web editor; the contractors are allowed to use spare desks located in the Central News Division's Los Angeles office as needed. Payton Decl. ¶¶ 3, 5; *see also* Jackson Decl. ¶ 7. The contractors are not staff but instead work freelance on a day rate and are expected to work independently. Jackson Decl. ¶ 7. PNN does ***not*** currently have any full-time employees in Los Angeles nor does it perform any on-air work in Los Angeles. *Id.* ¶ 8. Plaintiff does not dispute this nor has she offered any evidence to contradict Defendants' sworn assertion that PNN does not have any full time employment positions available at VOA's office in Los Angeles. Similarly, there is no evidence in the record indicating that any full-time PNN employee assigned to PNN's Washington, D.C. office has ever been permitted to work remotely from VOA's Los Angeles office for an extended period of time.[5]

---

[5] Although Plaintiff generally asserts that many of VOA's employees "telecommute to work from all around the nation on a regular basis," Pl.'s Reply at 19-20, Plaintiff has not proffered any evidence that any PNN employee assigned to the Washington, D.C. office has been permitted to work remotely from the VOA's Los Angeles office for an extended period of time. Moreover, Plaintiff's sole support for her assertion that VOA employees regularly telecommute is the testimony of AFGE Local 1812 President Timothy E. Shamble. *See* Pl.'s Reply at 20 & Ex. B (Second Declaration of Timothy E. Shamble). Importantly, however, although Mr. Shamble recounts several examples of PNN employees at the Washington, D.C. PNN office who

## 2.      Plaintiff's Allegations of Sexual Harassment and Retaliation

As set forth in Plaintiff's Amended Complaint, she asserts that she has been the subject of ongoing retaliation and sexual harassment by various BBG employees since the fall of 2008. Specifically, Plaintiff alleges that in or around September 2008, while she was serving in the role as a reporter and anchor for the PNN television show "Today's Woman," Plaintiff was "berated and verbally attacked" by a BBG Senior Executive Producer. Am. Compl., Docket No. [35], at 3.[6] Plaintiff asserts that as a result of these verbal attacks and the associated stress, she had to be rushed to the hospital emergency room on or around September 8, 2008, and was subsequently diagnosed with severe upper gastrointestinal bleeding and migraines. *Id.*

In addition, Plaintiff asserts that beginning on or about March 1, 2009, she was subjected to unwanted verbal and physical advances by a married, male BBG co-worker who served as her co-host on the television show "Straight Talk." *See id.* at 4. Plaintiff alleges that when she refused her co-host's advances and complained of these incidents to her supervisors at PNN, the co-worker attempted to have Plaintiff removed from her co-anchor position on "Straight Talk."

---

have been allowed to relocate to or work from New York, *see id.* ¶¶ 4-6, he does not indicate that any PNN employees have previously been permitted to relocate to or work from the VOA office in Los Angeles, *see generally id.* Indeed, Mr. Shamble now concedes that he "do[es] not personally know of any VOA employees who have been relocated or transferred to the Los Angeles office of the VOA." Pl.'s Supp. Mem. in Support of Mot., Docket No. [44], (hereinafter, "Pl.'s Supp. Mem."), Ex. DD (Third Declaration of Timothy E. Shamble) (hereinafter, "Third Shamble Decl."), ¶ 5. Accordingly, even accepting Mr. Shamble's statements, there is no evidence in the record that PNN employees, like Plaintiff, who are stationed in Washington, D.C., have previously been permitted to work remotely from the VOA office in Los Angeles.

[6] Plaintiff's Amended Complaint contains several duplicative and/or misnumbered paragraphs. Given these typographical errors and the fact that the numbered paragraphs in the Amended Complaint often number several pages in length, the Court for clarity shall cite to the relevant page number only in referencing Plaintiff's Amended Complaint.

*Id.* Beginning in July of 2009, Plaintiff asserts that this co-worker "began and perpetrated a continuous and daily campaign which included but was not limited to publicly disparaging Plaintiff's language ability in Farsi," "manufactur[ing] false complaints from viewers about Plaintiff . . . and . . . publish[ing] these false complaints to Plaintiff's supervisors," and advising Plaintiff's supervisors that Plaintiff "lacked the skills to be a television anchor." *Id.* at 5. As a result of these actions, Plaintiff alleges that she lost her job as a co-anchor on "Straight Talk" and was "relegated to what are in effect menial chores at VOA/PNN." *Id.*

Plaintiff also alleges that Defendants have retaliated against her for her self-described "strong personal views that VOA/PNN should be more pro-American and supportive of the opposition freedom movement in Iran." *Id.* at 6. According to Plaintiff, PNN is "mismanaged" and displays a "pro Islamic Regime" and "intentionally propagate[s] anti-American propaganda." *Id.* Plaintiff asserts that, "[a]s a result of [her] personal beliefs, and what is perceived to be her having 'blown the whistle' on Defendants for mismanaging and misusing VOA/PNN to promote anti-American and anti-Iranian freedom movement rhetoric, Defendants . . . sought to retaliate against Plaintiff [] when she raised with them the [allegations of] sexual harassment." *Id.* at 5-6. Specifically, Plaintiff asserts in her Amended Complaint that Defendants have: (a) "berat[ed] and disparag[ed] Plaintiff's [] Farsi language capability;" (b) "refuse[d] to grant Plaintiff [] advance sick leave;" (c) "relegate[d] Plaintiff [] to menial chores;" (d) "creat[ed] and spread[] false rumors about Plaintiff's [] alleged personal life before she joined VOA/PNN;" (e) "disparage[d] Plaintiff's [] reputation and ability by telling her and others at VOA/PNN that she only got her position because she is beautiful;" (f) "refus[ed] to grant Plaintiff [] a 'reasonable medical accommodation' by allowing her to be detailed to the Los Angeles office of VOA/PNN;" (g)

"provided false information to the Justice Department" concerning Plaintiff's related lawsuit, *Sataki v. Falahati*, 10cv466 (CKK), and "commenced a fraudulent internal investigation of the sexual harassment and retaliation charges;" (h) "illegally withheld payment of Plaintiff's [] salary and other benefits;" (i) "unlawfully with[held] Plaintiff's [] personnel file;" and (j) "threat[ened] Plaintiff with mutilation of her vaginal areas, severe bodily injury and death and smearing her name and reputation on pornographic internet websites." *Id.* at 8-11. Defendants dispute Plaintiff's allegations. Given the Court's resolution of Plaintiff's motions, as set forth more fully below, it need not and does not resolve the ultimate merits of Plaintiff's allegations at this time.

3.    Plaintiff's Alleged Disabilities Resulting from Defendants' Actions

Plaintiff asserts that, as a result of these alleged actions by Defendants, she has suffered mental and physical injuries. *See id.* at 12. For purposes of evaluating Plaintiff's request for interim injunctive relief only, Defendants have not factually disputed Plaintiff's allegations regarding the severity of her self-reported physical and mental injuries nor have they challenged the medical conclusions reached by Plaintiff's treating psychologist and psychiatrist. The Court shall therefore do the same. As such, the medical evidence in the record with respect to Plaintiff's present injuries is undisputed for purposes of the instant Memorandum Opinion, and there is no need to hold an evidentiary hearing to permit further testimony on this issue.

Plaintiff states that at some unspecified point in February 2010, she used annual leave to voluntarily travel to Los Angeles, California, because she "could not even stand to be in the same town as [her] sexual harasser, much less the same building." *See* Pl.'s Supp. Reply in Support of her Mot., Docket No. [44], Ex. EE (Third Declaration of Elham Sataki) (hereinafter, "Third Sataki Decl."), ¶ 13; *see also* Am. Compl. at 8. While there, Plaintiff alleges that she suffered "a

complete nervous breakdown," causing her to become "mentally and physically disabled." *Id.* at

8.  It appears from the record that Plaintiff subsequently informed BBG that she could not return

to work at her position in PNN's Washington, D.C. office; in response, on or around February 22,

2010, BBG advised Plaintiff that the Chief of Staff for VOA had authorized her to instead be

detailed to the Middle East Desk at the Central News Division in Washington, D.C., during the

course of the investigation into her claims of sexual harassment and retaliation.  Defs.' Opp'n,

Ex. 7 (Declaration of Barbara N. Brady) (hereinafter, "Brady Decl."), ¶ 2; *see also* Pl.'s Mot., Ex.

9 (May 12, 2010 Letter from Donna S. Grace, Director of the Office of Human Resources, to

Plaintiff's counsel).  Plaintiff declined the offered accommodation.

On February 24, 2010, Plaintiff was diagnosed by Dr. Arlene T. Aviera, her treating

clinical psychologist, as suffering from a major depressive disorder.  *See* Pl.'s Opp'n, Ex. 6

(medical reports prepared by Dr. Aviera).  Plaintiff was also reported to suffer from migraine

headaches and to have a history of a bleeding ulcer with recurring pain.  *Id.*  Dr. Aviera opined

that Plaintiff was unable to work at that time.  *Id.*  This opinion was reaffirmed by Dr. Aviera in a

follow-up report dated March 18, 2010.  *See id.* (first follow-up report by Dr. Aviera dated March

18, 2010, confirming that Plaintiff continued to suffer from a major depressive disorder, but

indicating that there had been "some positive shift in [Plaintiff's] depressed mood" and

recommending that Plaintiff "continue on disability").

On March 10, 2010, having exhausted all but 4 and 1/4 hours of her annual leave and 4

hours of her sick leave, Plaintiff requested leave under the Family Medical Leave Act and/or

advanced annual or sick leave.  Defs.' Opp'n, Ex. 4 (Declaration of Lisa Anderson) (hereinafter,

"Anderson Decl."), ¶¶ 2-3.  PNN provided Plaintiff with advanced annual leave for payperiods 5

and 6, but determined that she was not eligible for advanced sick leave under BBG's human resource policies. *Id.* ¶¶ 4-5. Specifically, as BBG advised Plaintiff's counsel, in order to obtain advanced sick leave, an employee must demonstrate that she will return to duty after the period of sick leave is completed; because Plaintiff did not provide BBG at that time with any medical documentation indicating a date by which it was expected that she could return to work after the period of sick leave was completed, Plaintiff was found to be ineligible for the advanced sick leave. *Id.* ¶ 5.[7] Plaintiff thereafter applied for BBG's donated leave program and was placed in the program retroactive to February 28, 2010. *Id.* ¶ 6. As of May 25, 2010, Plaintiff had received 114 hours of donated leave, which was given to her for pay periods 5, 6, 7, 8, 9, and 10. *Id.* Altogether, between pay periods 5 through 10 (February 28, 2010 through May 21, 2010), Plaintiff was paid for approximately 218.25 of the 274.25 hours in those pay periods through the combined use of annual leave, advanced leave, and accrued annual and sick leave. Defs.' Supp. Surreply, Docket No. [52], Ex. 13 (Declaration of Joann Lusby), ¶ 2.

On April 19, 2010, Plaintiff's treating clinical psychologist, Dr. Aviera, provided a follow-up to her previous medical reports, indicating that "while the diagnosis of Major Depressive Disorder still holds, [Plaintiff] continues to manifest some psychological improvement." *See* Pl.'s Mot., Ex. 6 (medical reports prepared by Dr. Aviera). Dr. Aviera

---

[7] While Plaintiff contends that Defendants' explanation for denying Plaintiff advanced sick leave is "disingenuous and spurious," Pl.'s Reply at 6, Plaintiff has not offered any evidence contradicting Ms. Anderson's sworn statement that a specific return date is required under BBG policy in order to be eligible for advanced sick leave. At the time of the March 10, 2010 request, Dr. Aviera had not yet indicated that Plaintiff could return to work and therefore no specific return date was provided, as required.

"recommended that [Plaintiff] return to work on May 5, 2010."[8]  *Id.*  She further indicated that

"[a]lthough the depressive symptoms are still present, they have subsided enough that [Plaintiff]

would be able to carry out her duties," assuming that Plaintiff could be placed in "a work

environment in which she would not be in the presence of the individual who harassed her in the

past."  *Id.*  Finally, Dr. Aviera concluded that, "[i]t is essential in my professional opinion that

[Plaintiff] would continue to live in Los Angeles."  *Id.*

     Based on this recommendation, on or about May 7, 2010, Plaintiff advised BBG, through

her attorney, that she was prepared to and would report to work, but indicated that she would

report to the VOA office in Los Angeles.  *See* Pl.'s Mot., Ex. 9 (May 12, 2010 Letter from Donna

S. Grace, Director of the Office of Human Resources, to Plaintiff's counsel).  By letter dated May

12, 2010, BBG advised Plaintiff that she should instead report for duty in Washington, D.C. and

repeated its offer to detail her to the Central News Division.  *See id.*  She was further informed

that failure to report for work in Washington, D.C., on May 14, 2010, without prior authorization

for additional leave, would be grounds for placing her on Absence Without Leave ("AWOL")

status, which could form the basis for disciplinary action.  *See id.*

     In response, Plaintiff provided a letter from Dr. Aviera, dated May 13, 2010, in which Dr.

Aviera "strongly recommend[ed]" that Plaintiff be permitted to work in Los Angeles.  *See* Pl.'s

Mot., Ex. 9 (May 13, 2010 Letter from Dr. Aviera to Donna S. Grace, Director of the Office of

Human Resources).  Dr. Aviera's letter was forwarded by Plaintiff's counsel to BBG on May 14,

---

[8] It appears that Dr. Aviera subsequently amended her opinion in a memorandum dated May 5, 2010, to state that Plaintiff could not report to work until May 14, 2010.  *See* Pl.'s Mot., Ex. 9 (May 12, 2010 Letter from Donna S. Grace to Plaintiff).  That memorandum is not in the record now before the Court.

2010, along with an email again stating that Plaintiff would report to the VOA office in Los Angeles. *See* Pl.'s Mot., Ex. 9 (May 14, 2010 emails). On May 18, 2010, BBG sent a letter to Plaintiff, via counsel, reiterating that no position existed in Los Angeles and indicating that Plaintiff had been placed on AWOL status in light of her failure to report for duty consistent with its prior communications. *See id.* (May 18, 2010 Letter from John Lennon to Plaintiff's Counsel). BBG further advised Plaintiff that her request for a reassignment to the Los Angeles office of VOA was not a reasonable accommodation and therefore requested that Plaintiff resubmit a valid reasonable accommodation supported with proper medical documentation. *Id.*

As a result of this communication from BBG, Plaintiff self-reported an escalation in her depression and anxiety, which required an increase in her medication and more frequent psychotherapeutic interventions and also caused Plaintiff to relapse "into a suicidal despair." Pl.'s Supp. Mem., Ex. BB (May 28, 2010 Letter from Dr. Aviera). As of May 28, 2010, Dr. Aviera opined that "if [Plaintiff] is forced to return to this atmosphere in the D.C. office, . . . she will inevitably suffer a severe deterioration in her mental condition that could again put her at a substantial suicidal risk." *Id.* Plaintiff's psychiatrist, Dr. James T. Long, concurs with Dr. Aviera on this latter point and concludes that, "[i]f given a new environment, away from the one in which she was injured, she will, in time, with continued treatment be able to be a full functioning individual in the work arena performing the same tasks as before she was injured." Pl.'s Supp. Mem., Ex. AA (Declaration of Dr. James T. Long) (hereinafter, "Long Decl.").

At present, Plaintiff remains in Los Angeles and has not reported to work in Washington, D.C. BBG recently advised the Court that, in an effort to compromise on the issues raised in Plaintiff's Motion, it has agreed to place Plaintiff on leave without pay status (LWOP") and

therefore no longer classifies her as AWOL. *See* Defs.' Supp. Opp'n, Docket No. [46], Ex. 1 (June 17, 2010 Letter from John Lennon to Plaintiff). As Defendants explain, leave without pay is a category of approved absence from duty that is always unpaid. Def.'s Supp. Surreply, Ex. 15 (Second Declaration of Donna S. Grace) (hereinafter, "Second Grace Decl."), ¶ 3. An employee placed on LWOP retains all of her health insurance benefits and remains fully insured throughout the period of LWOP. *Id.* ¶ 7. While Plaintiff remains on LWOP, the Government continues to pay its portion of her health insurance premiums. *Id.* Because Plaintiff is not receiving a salary while she is on LWOP, however, she does not pay her portion of the insurance premium through payroll deduction during her absence from work; rather, in accordance with government-wide pay regulations, she will receive a bill for her share of health insurance premiums owed from her period of LWOP when she returns to work and once again begins earning a salary. *Id.* Importantly, the fact that Plaintiff is not presently paying her share of the premium while on LWOP status does not cause an interruption of her health benefits. *Id.* Accordingly, as a result of BBG's decision to place Plaintiff on LWOP, she has not been terminated and thus, unlike a terminated employee, has not lost access to any previously-held health insurance coverage. Finally, the Court notes that in deciding to place Plaintiff on LWOP, Defendants denied Plaintiff's request to be placed on paid administrative leave. Defendants indicate that Plaintiff's request was denied because she was found to be ineligible for paid administrative leave.[9] First Grace Decl. ¶ 6. Pursuant to BBG practice and policy, administrative leave is generally only used for court leave; labor organization activities; physical examinations when ordered by the agency;

---

[9] Pursuant to BBG policy, administrative leave is always paid leave that is not charged to or taken from an employee's balance of annual or sick leave. *See* Second Grace Decl. ¶ 2.

injury or illness in the performance of duty; civil activities, such as voting; conferences and conventions when attendance is ordered by the head of the agency; civil defense activities; medical examinations for enlistments in the armed forces; and attendance at funerals of relatives killed in the line of duty. Second Grace Decl. ¶ 2. Although there is discretion in granting administrative leave, BBG generally follows its policy and grants administrative leave only in the limited circumstances previously described. *Id.* BBG explains that, pursuant to this policy, it denied Plaintiff's request for administrative leave because her request "does not fall within any of the[se] appropriate uses of administrative leave" and "[i]t is not the agency's policy or practice . . . to place administrative employees on administrative leave based solely on unproven allegations of sexual harassment." First Grace Decl. ¶ 6; *see also* Second Grace Decl. ¶ 6 ("Employees who file administrative complaints of sexual harassment and/or retaliation in the workplace typically are not placed on administrative leave.").

Plaintiff contends that this denial was in error. Pl.'s Mot. at 15; *see also* Pl.'s Supp. Reply at 6. While Plaintiff does not now seek an order requiring Defendants to place her on administrative leave as part of her request for interim injunctive relief, *see* Am. Compl. at 18-19, she does repeatedly point to Defendants' decision denying her administrative leave as an example of their allegedly discriminatory and unlawful behavior towards her, *see id.* at 18. Specifically, Plaintiff directs the Court to section 691.3 of the agency's Manual of Operations and Administration, which governs the use of excused absences for injury or illness in the line of duty. *See* Pl.'s Mot. at 15. Plaintiff highlights language in that section indicating that "[a]n employee injured in the performance of duty is not charged leave when absent for examination or outpatient treatment by a physician . . . ," and from this argues that Plaintiff is qualified for

administrative leave.  *See id.*  Had Plaintiff accurately quoted this section in full, however, it would have been clear that her reliance on this provision is misplaced, as the cited section provides in full that:

> An employee injured in the performance of duty is not charged leave when absent for examination or outpatient treatment by a physician or facility ***officially authorized to handle cases of employees injured in the performance of duty.  This provision does not apply, however, to additional absence on account of the injury where treatment is not involved.***

*See* Pl.'s Mot., Ex. 10 (VOA Manual of Operations & Administration), § 691.3.a (emphasis added); *see also* First Grace Decl., Ex. D (same).  Plaintiff has not argued, much less shown, that she is presently receiving treatment from a physician authorized by BBG to handle workplace injuries.  Moreover, as explained by Defendants, this section is intended to apply to employees who have been injured in the performance of their duties and who intend to seek workers' compensation benefits.  Second Grace Decl. ¶ 4.  Plaintiff declined to pursue workers' compensation benefits in this case, *see* Pl.'s Supp. Resp. to Defs.' Supp. Surreply, Docket No. [56], at 9 (acknowledging that Plaintiff declined to pursue a worker's compensation claim), and therefore is not entitled to administrative leave under this provision.  Accordingly, on the present record, Plaintiff has not shown that Defendants improperly denied her administrative leave.[10]

---

[10] Plaintiff makes much of the fact that Defendants have placed her alleged harasser on administrative leave pending completion of the investigation into Plaintiff's allegations of harassment.  BBG asserts that the decision to place Plaintiff's co-worker on administrative leave is consistent with the Office of Personnel Management's guidance indicating that "[a] supervisor may use administrative leave to keep an employee away from the worksite to ensure the safety of employees while conducting further investigation and deciding a course of action."  First Grace Decl. ¶ 5.  In this case, BBG determined that "[i]n order to ensure the safety of other female employees while the agency investigates the[] extremely serious charges [made by Plaintiff], the agency appropriately used administrative leave."  *Id.* ¶ 6.  Plaintiff has not offered any evidence to indicate that Ms. Grace has misstated or mischaracterized the applicable policies on

4.      BBG's Efforts to Accommodate Plaintiff and Her Request to Work
        Remotely from Los Angeles

As indicated above, BBG offered to detail Plaintiff to a vacant position at the Central

News Desk during the pendency of the investigation into her complaints of harassment and

retaliation.  The accommodation was offered in compliance with EEOC policy, which directs the

agency to locate a vacant position to which the complainant may be placed that will separate her

from the accused harasser.  Second Grace Decl. ¶ 6.  Defendants assert that the detail would

permit Plaintiff to continue to conduct the job duties she performed at PNN, such as field

reporting and working on packages, although her work would be produced in English.  Brady

Decl. ¶ 3.  Plaintiff would have reported directly to and been supervised by Central News

Division staff.  *Id.*  The Central News Division's office does not share space with PNN, and the

detail was therefore intended to separate Plaintiff from the PNN co-worker whom she alleges

sexually harassed and assaulted her as well as her PNN supervisors whom she claims retaliated

against her.  *Id.* ¶ 4.

Plaintiff has consistently refused this accommodation as inadequate and has instead

maintained that the sole appropriate accommodation is to permit her to work remotely from Los

Angeles.  *See* Pl.'s Reply at 13, n. 1; *see also* Third Sataki Decl. ¶¶ 2-10.  Plaintiff further argues

that the offered assignment to the Central News Division is inadequate because: (a) she lacks

sufficient English proficiency; (b) she is unable to speak Arabic; (c) Arabic and Persians "each

administrative leave.  In addition, Defendants recently advised the Court that the agency's Office
of Human Resources has completed its investigation into Plaintiff's allegations and has
determined that the co-worker at issue is not a safety risk to other employees.  Second Grace
Decl. ¶ 6.  He has therefore returned to the workplace.  *Id.*

have very strong and conflicting cultures, such that her ability to report on Arabic news would be hampered;" and (d) although the Central News Division and PNN have separate offices, they are located in the same building and share the same recording studios, walkways and common areas, such that she would likely be exposed to her alleged harasser and PNN management. *See* Pl.'s Reply at 13, n. 1; *see also* Third Sataki Decl. ¶¶ 2-10. Contrary to Plaintiff's concerns, however, the record indicates that the detail to the Central News Division would have permitted Plaintiff to continue reporting on Persian-related issues and would not have limited Plaintiff to reporting only on Arabic news stories. *See, e.g.*, Pl.'s Mot., Ex. 11 (May 12, 2010 Letter from Donna S. Grace to Plaintiff) (indicating that under the detail to the Central News Division, Plaintiff "would continue to work on Iran-related news stories"); Brady Decl. ¶ 3 (indicating that packages produced by Plaintiff at the Central News Division would be made available for all of the language services of VOA, including PNN). Although the evidence in the record as to Plaintiff's ability to speak English is less clear, the Court accepts, for purposes of the instant Memorandum Opinion, Plaintiff's present assertion that she cannot fluently speak English.[11] There is also no indication that the assignment to the Central News Division requires a knowledge of Arabic; to

---

[11] Plaintiff initially raised the issue of her fluency in English in her pleadings filed in support of her request for a temporary restraining order. She failed at that time, however, to provide any evidence in support of her position that she lacked sufficient fluency in English. *See Sataki,* 2010 WL 2195799, *5 (observing that Plaintiff's assertion that she lacks fluency in English was "made only in Plaintiff's pleadings, and there is no evidence to support this claim"). To the contrary, the only evidence then in the record "indicate[d] that Plaintiff is fluent in English." *Id.* (citing to Plaintiff's resume, which represents that Plaintiff is able to fluently speak, read and write English). In response, Plaintiff has now supplemented the record with her third declaration, in which she avers for the first time that her level of fluency in English is not sufficient to report or host a television show in that language and that she speaks English with a "distinct accent." Third Sataki Decl. ¶¶ 2, 3. Plaintiff's own evidence on this point is therefore contradictory.

the contrary, the position requires work to be produced in English only. Brady Decl. ¶ 3.

In addition, although the Central News Division operates in the same building as PNN, such that a possibility remains that Plaintiff may encounter Defendants in the common areas of the building, BBG informed Plaintiff that access could be coordinated to ensure that there was no contact between Plaintiff and her alleged harasser; BBG also offered to work with Plaintiff, through her counsel, to ensure the arrangement worked efficiently. Brady Decl. ¶ 4. Plaintiff does not dispute this nor does she offer any evidence indicating that she responded to BBG's offer to discuss ways in which the detail to the Central News Division could be modified to respond to Plaintiff's concerns.

Rather, Plaintiff has consistently maintained that the sole appropriate accommodation for her alleged disabilities is to permit her to work from the Los Angeles office of the VOA. As indicated above, there is no available PNN position in Los Angeles, a point which Plaintiff concedes. Nor has any PNN employee previously been detailed to the Los Angeles VOA office or been permitted to work remotely from that office for an extended period of time, again a point which Plaintiff does not dispute. Plaintiff insists, however, that she is not asking PNN to create a new position for her in Los Angeles; rather, according to Plaintiff, she is seeking only authorization from BBG to perform her current job functions as an International Broadcaster from the Los Angeles VOA office during the pendency of her administrative and legal proceedings. *See* Third Sataki Decl. ¶ 22.[12]

_____

[12] As to this point, the Court notes that the exact nature of Plaintiff's requested accommodation has changed throughout the course of this litigation. Plaintiff initially advised the Court that she was "willing to do any work that is available in the Los Angeles office of VOA" and proposed that she be permitted to "do the work of the contractors in Los Angeles."

There is a dispute in the record as to the Plaintiff's capability to perform her current job functions remotely from Los Angeles. As noted above, Plaintiff is a GS-12 International Broadcaster for PNN and her responsibilities generally fall into two categories: (1) reading news segments for the shows "News and Views" and "News Brief," which are both taped in Washington, D.C.; and (2) performing general assignments, which involves going into the field, conducting interviews, and creating "packages." Jackson Decl. ¶ 3; First Sataki Decl. ¶ 6; First Grace Decl. ¶ 7. BBG asserts that Plaintiff is not capable of performing these duties from Los Angeles for two principal reasons. First, with respect to Plaintiff's responsibilities in connection with "News and Views" and "News Brief," BBG indicates that PNN does not perform any on-air work in Los Angeles nor does it have any employees or contractors who deliver the news from the Los Angeles Bureau the way Plaintiff did at the Washington, D.C. office. Jackson Decl. ¶ 8. Moreover, doing so "would require a fairly large support staff for the production and newsgathering and there is not enough news generated in Los Angeles to warrant such

_____

Second Sataki Decl. ¶ 9; *see also id.* ("These contractors, admittedly, are hired on a job by job basis so why not use a full time employee like myself do the work while I recover."). In denying Plaintiff's request for a temporary restraining order, the Court observed that "BBG [] 'is not obligated to 'bump' another employee in order to create a vacancy for the disabled employee'" nor is it obligated "to create a new position for the disabled employee.'" *Sataki*, 2010 WL 2195799, *10 (quoting *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1998)). In response, Plaintiff has now disavowed her prior request to permit her to perform the work of the contractors. *See* Third Sataki Decl. ¶ 22 ("I am not suggesting or requesting that the VOA remove the other contractor from her position to instead transfer me to the Los Angeles office."). Rather, she now indicates that she is "simply requesting that [she] be permitted to perform [her] job function . . . remotely from Los Angeles, at least for the time being as [she] recuperate[s] from [her] disabilities." *Id.* With this recent clarification, the Court shall proceed on the understanding that Plaintiff seeks only permission to perform her current job functions from Los Angeles and that she is not seeking an order requiring BBG to create a new position for her or to permit her to perform work that was previously performed by PNN contractors.

manpower." *Id.* Second, with respect to the production of packages, the record indicates, and the parties appear to agree, that the Los Angeles VOA's office has the appropriate technological equipment to permit a qualified individual — that is, an individual who is capable of working independently and without support or supervision — to produce packages in Los Angeles for PNN and to transmit the finished product to PNN's D.C. office for use. Indeed, as indicated above, PNN has two contract video journalists in Los Angeles who do just that. *See* Jackson Decl. ¶ 2. BBG maintains, however, that Plaintiff is not qualified to produce quality packages independently and without supervision and therefore cannot perform this function of her present job from Los Angeles. *See id.* ¶ 7 ("There are no packages that [Plaintiff] can do from Los Angeles because [she] is not skilled enough in journalism or production to meet minimum broadcast industry standards.").

By contrast, Plaintiff contends that she is capable of performing her current job functions from Los Angeles. Significantly, however, in making this argument, Plaintiff has focused exclusively on her ability to independently produce packages from Los Angeles for transmission back to Washington, D.C. and has failed to specifically address Defendants' assertion that Plaintiff cannot, as a practical matter, perform from Los Angeles her present on-air duties in connection with the shows "News and Views" and "News Brief," which are both taped in D.C. *See generally* Pl.'s Supp. Mem.; Second Sataki Decl.; Third Sataki Decl.[13] Accordingly, it is

_____

[13] As noted above, Plaintiff has introduced the testimony of Mr. Shamble in support of her position that VOA employees "telecommute to work from all around the nation on a regular basis." Pl.'s Reply at 19-20. Mr. Shamble's testimony, as with Plaintiff's evidence in general, is principally aimed at demonstrating that she can produce packages from Los Angeles and does not specifically reference or address Defendants' assertion that Plaintiff cannot perform her present on-air duties with respect to "News and Views" and "News Brief" from Los Angeles. *See*

undisputed on the present record that Plaintiff cannot perform her on-air work with respect to these shows from Los Angeles. Plaintiff, however, has emphatically denied Defendants' contention that she is not presently qualified to produce independent packages from Los Angeles. *See* Second Sataki Decl. ¶¶ 3-8; Third Sataki Decl. ¶¶ 18-19, 23.[14] As such, there exists a factual dispute as to Plaintiff's ability to independently produce packages. For the reasons set forth in the Court's legal discussion below, the Court ultimately concludes that this dispute does not preclude resolution of Plaintiff's request for a preliminary injunction and has not relied on these disputed facts in reaching its decision on the merits of Plaintiff's motions. The Court therefore does not resolve the parties' dispute on this issue at this time.

### 5. Plaintiff's Administrative Complaint

On March 25, 2010, BBG's Office of Civil Rights received a complaint from Plaintiff alleging discrimination and reprisal. *See* Defs.' Opp'n, Ex. 1 (EEO Complaint). The complaint was accepted on March 30, 2010, and the claims were revised on April 9, 2010. *See* Defs.' Opp'n, Ex. 5 (Declaration of Michael D. Hill) (hereinafter, "Hill Decl."), ¶ 4. The complaint is currently still within the administrative stage. *Id.* ¶ 5. Plaintiff therefore has not yet exhausted her administrative remedies.

---

*generally* Second Shamble Decl.; Third Shamble Decl. However, even if the Shamble Declarations were somehow intended to refute Defendants' statements on this point, Mr. Shamble's general statements regarding the availability of a "telecommuting" option are insufficient to create a material dispute of fact as to Defendants' specific assertions that Plaintiff is unable to read these news reports from Los Angeles. This is particularly so given Mr. Shamble's own admission that he is familiar with only "***some*** of the details of the work environment at the various VOA offices around the country." Third Shamble Decl. ¶ 1 (emphasis added).

[14] *See also* Pl.'s Reply, Ex. C (Second Declaration of Jamchid Chalangi) ¶ 3 (stating Plaintiff is capable of editing and producing packages); Second Shamble Decl. ¶¶ 8-9 (same).

*B.       Procedural History*

Plaintiff filed the above-captioned action on April 2, 2010, against BBG and the Individual Defendants, in both their individual and official capacities.[15] As set forth in Plaintiff's initial complaint, she alleges that Defendants have violated her constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments and that they have also denied her a reasonable accommodation for her alleged disability under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*[16] As indicated previously, Plaintiff's claims in this action are largely premised upon her allegations, asserted in the related civil action *Sataki v. Falahati*, Civ. Act. No. 10-466 (CKK), that she was, *inter alia*, sexually harassed and assaulted by a co-worker at BBG.  Plaintiff alleges in the present action that Defendants unlawfully facilitated the alleged sexual harassment, actively attempted to cover up the incidents of harassment, interfered with the investigation of her administrative complaint, and retaliated against her for complaining about her co-worker's harassing conduct as well as for criticizing BBG's management and mission.  Plaintiff further alleges that, as a result of these actions, she has suffered both mental and physical injuries.  She seeks compensatory and punitive damages and a permanent injunction ordering "that Plaintiff be given 'reasonable medical accommodation' by being detailed and installed permanently" in the Los Angeles office of VOA.  *See id.* at 21.

---

[15] The Individual Defendants have asserted, and Plaintiff has not disputed, that they have not yet been served in their individual capacities.  *See* Defs.' Supp. Opp'n at 1, n. 1. Accordingly, the Individual Defendants at present are appearing in their official capacity only. *See id.*

[16] Unlike Plaintiff's administrative complaint, Plaintiff has not alleged any claims under Title VII in the instant action.  Rather, Plaintiff has framed her allegations of harassment and retaliation as implicating her constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments.  *See generally* Am. Compl.

On May 20, 2010, Plaintiff filed a [11] Motion for a Temporary Restraining Order and/or Preliminary Injunction. As set forth therein, Plaintiff requested issuance of a temporary restraining order and/or preliminary injunction that, in Plaintiff's words: (1) "restrain[s] [BBG] from preventing Plaintiff from reporting to work immediately at the Los Angeles Office of Voice of America to perform her duties as an international broadcaster in the Persian News Service and be paid her normal salary henceforth as a Grade GS-12;" and (2) "restrain[s] [BBG] from not reimbursing Plaintiff for all back pay[,] used vacation time, and accrued benefits up to and including the present." Pl.'s Mot., Ex. 1 (Proposed Order).

Prior to resolution of that Motion, Defendants filed a [10] Notice of Related Case, advising Judge Richard W. Roberts, to whom this case was previously assigned, that this action was related to Civil Action No.10-466 (CKK), *Sataki v. Falahati*, as defined under the local rules, and the case was therefore reassigned to this Court by the Calendar Committee on May 25, 2010. *See* Docket No. [29] (Reassignment of Civil Case). The Court held an on-the-record conference call with counsel for all parties that same day to discuss Plaintiff's Motion. Plaintiff indicated at that time through her counsel that she wished to proceed directly to consideration of her request for a temporary restraining order. Accordingly, the Court held in abeyance Plaintiff's request for a preliminary injunction and set an expedited briefing schedule for consideration of Plaintiff's request for a temporary restraining order only. Pursuant to that schedule, Defendants filed their Opposition to Plaintiff's Motion on May 27, 2010, *see* Docket No. [30], and Plaintiff filed her Reply, on May 28, 2010, *see* Docket No. [32].[17] By Memorandum Opinion and Order dated June

---

[17] As the Court has previously noted, Plaintiff attached a series of new declarations to her Reply filed in support of her Motion for a Temporary Restraining Order and/or Preliminary

1, 2010, this Court denied Plaintiff's request for a temporary restraining order. *See Sataki v.*

*BBG*, __ F. Supp. 2d __, 2010 WL 2195799 (D.D.C. June 1, 2010).

On June 3, 2010, the parties submitted a [39] Status Report advising the Court that they

had been unable to reach an agreement that would consolidate consideration of the preliminary

injunction motion with the merits of Plaintiff's underlying claims. The parties therefore proposed

and the Court adopted an expedited briefing schedule for resolution of Plaintiff's request for a

preliminary injunction.[18] Pursuant to that schedule, Plaintiff filed a Supplemental Memorandum

in Support of her Motion for a Preliminary Injunction on June 11, 2010. *See* Docket No. [44].

Defendants filed their Response in Opposition to Plaintiff's Supplemental Memorandum on June

18, 2010. *See* Docket No. [46]. Plaintiff filed her Reply to Defendants' Supplemental

─────────────────────

Injunction. Pursuant to Local Civil Rule 65.1, applications for a preliminary injunction must be "accompanied by **all** affidavits on which the plaintiff intends to rely." LCvR 65.1(c) (emphasis added). "Supplemental affidavits [] to the application . . . may be filed only with permission of the court." *Id.* Plaintiff did not seek leave of the Court to file the additional materials with her Reply. The materials were therefore filed in violation of the local rules. Nonetheless, as the Court did in evaluating Plaintiff's request for a temporary restraining order, the Court has reviewed the attached declarations and has, in its discretion, considered them to the extent relevant. Plaintiff's assertion that the Court has excluded these affidavits from consideration is therefore inaccurate. *See* Pl.'s Supp. Resp. to Defs.' Surreply at 7.

[18] Plaintiff also generally indicated in the Joint Status Report that she wanted to take expedited discovery in this case for purposes of her preliminary injunction motion. Plaintiff, however, did "not provide[] the Court with any explanation of why such discovery is necessary at this time," and the Court was therefore unable to "make a determination on the present record as to whether the requested discovery is warranted for resolution of Plaintiff's motion for a preliminary injunction." June 4, 2010 Order, Docket No. [40], at 2. The Court advised Plaintiff that, "to the extent [she] continues to maintain that expedited discovery for the preliminary injunction is justified in this case, she must file an appropriate motion that clearly sets forth the specific factual and legal bases for the request under the standards applied in this Circuit to expedited discovery requests." *Id.* Plaintiff chose not to file any such motion. Plaintiff's assertions in her supplemental briefing challenging the Court's alleged failure to permit expedited discovery, *see, e.g.,* Pl.'s Supp. Mem. at 9, are therefore without merit.

Opposition on June 21, 2010, and subsequently supplemented that filing on June 22, 2010, *see* Docket No. [49].

Thereafter, on June 23, 2010, the Court directed Defendants to file a supplemental surreply addressing certain issues raised in Plaintiff's pleadings, *see* June 23, 2010 Min. Order, which Defendants filed on June 25, 2010, *see* Docket No. [52]. On June 29, 2010, Plaintiff responded by filing a Motion to Strike and in the Alternative Motion to File Response to Surreply of Defendants. *See* Docket No. [56]. By minute order dated that same day, the Court granted-in-part and denied-in-part Plaintiff's motion; specifically, Plaintiff's request to strike Defendants' Supplemental Surreply was denied, but her request to file a substantive response to the arguments contained therein was granted. *See* June 29, 2010 Min. Order. Noting that Plaintiff's motion included not only her request for leave to file but also contained substantive responses to Defendants' Supplemental Surreply, the Court indicated its understanding that Plaintiff intended her motion to serve as her substantive response to Defendants' Supplemental Surreply and that it would treat the filing as such. *See id.*[19] The Court, however, provided Plaintiff an opportunity to file a supplemental substantive response by separate pleading, in the event she disagreed with that understanding. *Id.* No such filing was made, and briefing on Plaintiff's Motion for a Preliminary Injunction is now complete. Although Plaintiff did not file a request for expedited resolution of

---

[19] Both Defendants and Plaintiff have attached additional affidavits and exhibits to their respective Supplemental Surreply and Supplemental Response. *See* Defs.' Supp. Surreply; Pl.'s Supp. Resp. to Defs.' Surreply. Given the Court's orders directing Defendants to file the Supplemental Surreply and granting Plaintiff's motion for leave to file a response to Defendants' Surreply, the additional exhibits attached to those filings were submitted with leave of the Court and — unlike the affidavits attached to Plaintiff's initial Reply — were therefore filed in compliance with Local Civil Rule 65.1.

her Motion for a Preliminary Injunction together with a statement of the facts which make expedition essential, as provided for under Local Civil Rule 65.1(d), the Court nonetheless has moved as expeditiously as possible to resolve Plaintiff's request and is issuing this decision within five business days of the completion of the parties' briefing on Plaintiff's Motion.

In addition, on June 6, 2010, Plaintiff filed a Motion for Reconsideration of the Court's June 1, 2010 decision denying her request for a temporary restraining order. *See* Docket No. [41]. Defendants filed an Opposition to Plaintiff's Motion for Reconsideration on June 28, 2010, *see* Docket No. [55], and Plaintiff filed a Reply in Support of her Motion for Reconsideration on June 30, 2010, *see* Docket No. [58]. Plaintiff's Motion for Reconsideration is therefore fully briefed and ripe for the Court's resolution as well.[20]

Finally, the Court notes that Plaintiff has filed an Amended Complaint as well in this case. *See* Docket No. [35]. The Amended Complaint consists of the same allegations included in Plaintiff's original complaint, but is amended to make clear that Plaintiff is seeking temporary injunctive relief pursuant to the D.C. Circuit's decision in *Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987). *See* Pl.'s Notice of Amended Compl., Docket No. [33]. To that end, Plaintiff has amended her complaint to include a claim for "Wagner Temporary Relief." *See* Am. Compl. at 18. Plaintiff alleges that "under *Wagner* [] and given the on-going [*sic*] EEO administrative

_____

[20] Plaintiff has also filed a [42] Motion to Reassign and Remand Case, by Consent or Otherwise, to Prior Trial Judge Richard W. Roberts or, in Alternative, to Assign Sataki Cases to Another Trial Judge Through Random Assignment System. The Court has ruled on this motion by separate Order issued this same day. In addition, Defendants have filed a [45] Motion to Dismiss or in the Alternative for Summary Judgment. Pursuant to the briefing schedule suggested by the parties and adopted by the Court, briefing on that motion will not be completed until August 4, 2010.

investigation of work place retaliation by Defendants . . ., Plaintiff is entitled to temporary relief to preserve the status quo [until] the administrative process is exhausted." *Id.* Specifically, Plaintiff asks that a "preliminary injunction be entered to require Defendant BBG and VOA to detail Ms. Sataki to the Los Angeles office during her period of on-going rehabilitation under the medical care of her doctors, and pay her back pay, as she has not been so paid in full." *Id.*

## II. LEGAL STANDARDS AND DISCUSSION

The Court's resolution of Plaintiff's requests for interim injunctive relief, both in the form of a temporary restraining order and a preliminary injunction, has been hampered by the shifting nature of Plaintiff's legal arguments in support of the requested relief. Plaintiff initially moved for a temporary restraining order based solely on her allegations, as set forth in her initial complaint, that Defendants had violated her constitutional rights and had denied her a reasonable accommodation in violation of the Rehabilitation Act. *See* Pl.'s Mot. Defendants opposed Plaintiff's request for a temporary restraining order arguing, *inter alia*, that she was unlikely to succeed on her constitutional claims and that this Court lacked jurisdiction over Plaintiff's Rehabilitation Act claim given her failure to exhaust her administrative remedies prior to filing suit. *See* Defs.' Opp'n. In response, Plaintiff argued for the first time in her Reply briefing that this Court has authority under the D.C. Circuit's decision in *Wagner v. Taylor* to "intervene to temporarily preserve the status quo," even though she has not yet exhausted her administrative remedies. *See* Pl.'s Reply at 9. However, in arguing that the requested interim injunctive relief was warranted, Plaintiff continued to focus on her claims in this lawsuit that Defendants had violated her constitutional rights and denied her a reasonable accommodation under the Rehabilitation Act. *Id.* (asserting that emergency relief was necessary to "prevent[] further

irreparable harm to Ms. Sataki[] . . . due to Defendants' retaliatory actions and violation of her

constitutional rights"); *see also id.* at 15-19 (arguing that issuance of the requested relief was

necessary based on Defendants' violation of Plaintiff's constitutional rights).  The Court

subsequently denied Plaintiff's request for a temporary restraining order, finding that Plaintiff had

failed to demonstrate a substantial likelihood of success as to her constitutional claims and her

claim under the Rehabilitation Act.  *See Sataki*, 2010 WL 2195799.

In response, Plaintiff now argues that she seeks a preliminary injunction based solely on

her "*Wagner* claim" as asserted in the Amended Complaint (which was amended after briefing on

Plaintiff's temporary restraining order had been completed).  *See* Pl.'s Supp. Mem. at 1-2, 3-4.

That is, Plaintiff states that she is only seeking injunctive relief to maintain the status quo during

the pendency of the administrative proceedings on her claims under Title VII and the

Rehabilitation Act.  *See id.*  Plaintiff thus no longer seeks to base her request for preliminary

injunctive relief on her constitutional claims asserted in this case and in fact argues that such

claims are irrelevant to the present analysis.  *See id.* at 4.  The Court therefore proceeds to

consider Plaintiff's request for injunctive relief purportedly aimed at preserving the status quo

during the pendency of her administrative proceedings.

     A.     *Plaintiff's Motion for Preliminary Injunction*

          1.     <u>Whether Plaintiff has Failed to Establish that this Court has Authority to</u>
                 <u>Issue the Requested Mandatory Injunctive Relief</u>

As previously explained, Plaintiff's administrative complaint remains pending, and she

therefore has not exhausted her administrative remedies.  While Plaintiff's failure to exhaust will,

as Defendants argue, bar this Court from deciding the merits of Plaintiff's claims, *see generally*

Defs.' MTD, it does not necessarily deprive the Court of jurisdiction over Plaintiff's Motion for a Preliminary Injunction. In *Wagner*, the D.C. Circuit held that "federal district courts are authorized to afford interim injunctive relief against retaliatory transfers and other acts of reprisal while the administrative and judicial processes are ongoing." 836 F.2d at 570. Accordingly, if "the court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction, despite the agency's primary jurisdiction, gives the court authority to impose a temporary restraint in order to preserve the ***status quo*** pending ripening of the claim for judicial review." *Id.* at 571 (emphasis added); *see also Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 4 (D.D.C. 1998) ("Although Title VII typically conditions suit in federal court on exhaustion of administrative remedies, it is settled law in this Circuit that federal employees enjoy the right to seek interim injunctive relief to maintain the status quo.") (internal citations omitted).

Plaintiff has relied on the D.C. Circuit's decision in *Wagner* for the assertion that this Court has the authority to issue the interim injunctive relief requested in this case. As Defendants correctly emphasize, however, the Circuit Court has advised that the authority to issue such interim relief arises from the Court's "'limited judicial power to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels.'" *Wagner*, 836 F.2d at 571 (quoting *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966)). Accordingly, while courts in this Circuit have entertained requests for interim injunctive relief during the pendency of an administrative review, they have done so only in situations in which the employee faces a transfer, firing or a similarly adverse change in his or her employment status. *See, e.g., id.* at 569-70 (plaintiff sought a temporary injunction to avoid future reprisal including proposed transfer); *Jordan v. Evans*, 355 F. Supp. 2d 72, 76 (D.D.C.

2004) (plaintiff sought temporary restraining order to return her to pre-transfer position and to enjoin any action to remove her from her position); *Nichols*, 18 F. Supp. 2d at 2 (employee sought to enjoin agency from terminating him).

Here, Plaintiff seeks to ***alter*** the status quo. Despite Plaintiff's repeated attempts to characterize the relief sought as "preserv[ing] the status quo," Pl.'s Reply at 2, it is patently clear that she seeks mandatory injunctive relief ordering Defendants to affirmatively permit Plaintiff — who was not previously detailed to nor permitted to work from the VOA's Los Angeles Office — to perform her job functions remotely from Los Angeles during the course of the pending administrative proceedings. Regardless of how her request for interim relief is framed, Plaintiff is asking this Court to intervene in an ongoing personnel dispute and direct the outcome of that dispute by imposing Plaintiff's preferred resolution on the agency — all before the dispute has been conclusively resolved and long before it is ripe for judicial review. *Wagner* itself does not support Plaintiff's request for a preliminary injunction altering the status quo, and Plaintiff has not pointed to any case law supporting her position that the Court has authority to issue such relief.[21]

---

[21] As the Court previously noted in denying Plaintiff's request for a temporary restraining order, the D.C. Circuit's decision in *Wagner* held that the failure to exhaust administrative remedies in a Title VII discrimination action is not dispositive in considering a request for interim injunctive relief during the pendency of administrative proceedings. 836 F.2d at 575. This holding, however, has not been explicitly extended to a federal employee's disability claims brought under the Rehabilitation Act. *See Sataki*, 2010 WL 2195799, at 88, n.14. Moreover, "[t]here are important distinctions between Title VII and the Rehabilitation Act that may militate against such an extension; for example, administrative exhaustion under the Rehabilitation Act, but not Title VII, is jurisdictional." *Id.* Despite the Court's prior discussion on this point, Plaintiff has not presented the Court with any case law applying *Wagner* to claims brought under the Rehabilitation Act nor has she specifically addressed whether the Court should extend *Wagner* to her allegations that Defendants failed to provide a reasonable accommodation.

In this way, there is a fundamental disconnect between the relief Plaintiff now seeks and the legal authority she relies upon in support of such relief. Plaintiff maintains that she is entitled to an order authorizing her to work from Los Angeles because (a) such relief is necessary to maintain the status quo pending resolution by the agency of her discrimination claims and (b) D.C. Circuit precedent authorizes a court to issue injunctive relief to maintain the status quo in such circumstances. As framed by Plaintiff, issuance of the requested preliminary injunction is thus premised upon acceptance of her assertion that she seeks only to preserve the status quo. The facts of this case clearly demonstrate that an order permitting Plaintiff to work from Los Angeles is not designed to maintain the status quo but would in fact affirmatively alter the status quo. Plaintiff's argument in support of her request for a preliminary injunction is therefore based on a fatally flawed premise. Moreover, in the event Plaintiff's request is properly characterized as mandatory injunctive relief, Plaintiff has failed to advance any argument in the alternative that she is entitled to such relief. Consequently, Plaintiff has failed to demonstrate that the Court has authority to issue the requested relief altering the status quo during the pendency of her administrative proceedings. Plaintiff's Motion for a Preliminary Injunction fails for this reason alone.

      2.      <u>Plaintiff has Failed to Demonstrate that She is Entitled to the Requested Preliminary Injunctive Relief</u>

As discussed above, the Court's authority to issue the requested mandatory injunctive relief is far from clear, given the particular circumstances of this case. Nonetheless, even if the

---

Nonetheless, for purposes of this Memorandum Opinion, the Court shall again assume without deciding that the decision in *Wagner* may be appropriately extended to Rehabilitation Act claims as well.

Court were to find that it has the authority to order Defendants to permit Plaintiff to work from Los Angeles during the pendency of the administrative proceedings below, the D.C. Circuit has made clear that the Court may do so *only* if "the prerequisites for equitable intervention are met." *Wagner*, 836 F.2d at 575.[22] "The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 72-73 (D.D.C. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another area. *Id.*

---

[22] Plaintiff argues, without citation to any supporting legal authority, that "under the analysis of the *Wagner* court, for interim injunctive relief to issue, the first part of the test for equitable relief is virtually non-existent: likelihood of success on the merits." Pl.'s Reply at 8. This unsupported assertion is contrary to the *Wagner* decision itself, which made clear that a court must evaluate a request for interim injunctive relief under the traditional four-prong test. *See* 836 F.2d at 575-76. Similarly, Plaintiff has suggested that the Court has equitable authority to issue the requested relief because "it is not a big deal to allow a woman to work while she recuperates in a place she feels secure." Pl.'s Supp. Resp. to Defs.' Supp. Surreply at 10-11. Setting aside the accuracy of Plaintiff's characterization that the relief she seeks is no "big deal," under this Circuit's precedent, the Court must assess Plaintiff's request for injunctive relief under the standard four-factor test for issuance of a preliminary injunction.

35

(quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

Thus, "[a]n injunction may be justified, for example, where there is a particularly strong

likelihood of success on the merits even if there is a relatively slight showing of irreparable

injury." *CityFed*., 58 F.3d at 747. Notwithstanding the fluid nature of this familiar four-part

inquiry, both the Supreme Court and the Court of Appeals for the D.C. Circuit have emphasized

that a plaintiff must show at least ***some*** likelihood of irreparable harm in the absence of an

injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, __ U.S. __ , 129 S. Ct. 365, 375 (2008)

(holding that a plaintiff must "demonstrate that irreparable injury is ***likely*** in the absence of an

injunction," and not a mere "possibility") (emphasis in original); *CityFed*, 58 F.3d at 747 (holding

that a plaintiff must demonstrate "'at least some injury' for a preliminary injunction to issue . . .

[because] 'the basis of injunctive relief in federal courts has always been irreparable harm . . . .'"

(quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Similarly, "[i]t is particularly important

for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v.

District of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S.

1084, 1085 (1992)). If the movant fails to do so, inquiry into the remaining factors is

unnecessary, for the injunctive relief must be denied on that ground alone. *See Transohio Sav.

Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir.1992) (affirming denial of

preliminary injunction where the district court properly concluded that the plaintiff had "no

likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir.

2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction,

such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation'");

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("Given the inadequacy of

[plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). Applying these standards to the case at hand, the Court finds that Plaintiff has failed to demonstrate that she is entitled to a preliminary injunction on the present record.[23]

> a.   Plaintiff has failed to demonstrate that irreparable injury is likely in the absence of an injunction.

"[T]he basis of injunctive relief in federal courts has always been irreparable harm and the inadequacy of legal remedies." *Sampson*, 415 U.S. at 88 (internal quotation marks omitted). As such, a plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 129 S. Ct. at 375; *see also CityFed*, 58 F.3d at 747 (holding that a plaintiff must demonstrate "'at least some injury' for a preliminary injunction to issue . . . [because] 'the basis of injunctive relief in federal courts has always been irreparable

---

[23] For this reason, the Court declines to decide whether Plaintiff must meet an even higher burden of proof than outlined above because she is requesting mandatory injunctive relief — i.e., because she seeks to change the status quo through affirmative action rather than to merely preserve the status quo. *See* Defs.' Opp'n at 19 (urging Court to apply higher standard to Plaintiff's request for mandatory relief). This remains an open question in this Circuit. *See Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) (noting that the "D.C. Circuit . . . has not yet adopted or, for that matter, rejected th[e] rule" requiring a movant who seeks a mandatory injunction to meet a higher standard than in the ordinary case). Similarly, although not raised by either party, the Court notes that some courts in this Circuit have applied a higher standard to motions for preliminary injunctive relief in employment discrimination cases against the federal government. *See, e.g., Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) (holding that "a plaintiff seeking injunctive relief in a Title VII discrimination action against the federal government must make 'a more stringent showing of irreparable injury' and demonstrate that 'civil rights claims take precedence over the government's interest in making personnel decisions'") (quoting *Bonds v. Heyman*, 950 F. Supp. 1201, 1212 (D.D.C. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). The D.C. Circuit has yet to decisively resolve this issue. Accordingly, because the Court finds — as indicated above — that Plaintiff fails to meet the traditional showing required, it need not determine at this time whether a higher standard should apply in this case.

harm . . . .'" (quoting *Sampson*, 415 U.S. at 88)).  The alleged injury must be "both certain and

great," such that "there is a 'clear and present' need for equitable relief to prevent irreparable

harm."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation

marks omitted).  As the D.C. Circuit has emphasized,

> The key word in this consideration is ***irreparable***. Mere injuries, however substantial,
> in terms of money, time and energy necessarily expended in the absence of a stay are
> not enough. The possibility that adequate compensatory or other corrective relief will
> be available at a later date, in the ordinary course of litigation, weighs heavily against
> a claim of irreparable harm.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297-98 (emphasis in original) (internal

quotation marks omitted).

Here, in support of her assertion that she will suffer irreparable harm absent injunctive

relief, Plaintiff advances two arguments.  First, Plaintiff argues that she is suffering financial

difficulties as a result of her present status of being on leave without pay and Defendants' failure

to pay her salary and benefits allegedly owed to her during her absence from work.  *See* Pl.'s

Reply at 21; *see also* Second Sataki Decl. ¶ 9 ("I am bankrupt although I have not filed for

bankruptcy since I do not want to harm creditors, as I will pay them back someday.  I do not have

money for basic necessities, cannot pay my doctors or lawyer and live in constant fear of having

to live on the street, in effect.").  Second, Plaintiff asserts that her present physical and emotional

injuries would be substantially exacerbated if she were forced to return to PNN's Washington,

D.C. office.  Pl.'s Mot. at 10.  Plaintiff is currently undergoing therapy and receiving medical

treatment in Los Angeles, and both she and her doctors indicate that her recovery is contingent

upon her continued receipt of treatment in Los Angeles, which has become a "safe environment"

for Plaintiff.  *See, e.g.,* Third Sataki Decl. ¶ 15; Long Decl.; Pl.'s Opp'n, Ex. 6 (medical reports

prepared by Dr. Aviera).  In addition, although Plaintiff's health has improved, Plaintiff and her treating psychologist opine that "she will inevitably suffer a severe deterioration in her mental condition" if she is forced to return to Washington, D.C.  *See* Pl.'s Supp. Mem., Ex. BB (May 28, 2010 Letter from Dr. Aviera); *see also* Third Sataki Decl. ¶ 13 ("Just hearing the names of defendants sends chills down my spine and feelings of resentment, embarrassment, helplessness and sadness overwhelm[] me to the point that I withdraw from whatever activity I am engaged in and I cannot perform the normal activities of life - whether related to work or simple household functions.").

Neither of these arguments is sufficient to demonstrate irreparable injury in this case.  At bottom, Plaintiff's claims of irreparable injury are purely economic in nature.  Although Plaintiff argues that her health condition may be worsened if she is forced to return to Washington, D.C., the issue now before the Court is whether Plaintiff is entitled to an order mandating that Defendants permit Plaintiff to work from Los Angeles during the pendency of the administrative proceedings below.  The Court is not being asked to — and will never be asked to — affirmatively order Plaintiff to return to her duty station in Washington, D.C.   Contrary to Plaintiff's suggestion, denial of Plaintiff's motion for a preliminary injunction is ***not*** the equivalent of an order "forcing" Plaintiff to return to Washington, D.C.   Rather, as noted previously, Plaintiff is currently on leave without pay status, and she is therefore free to remain in Los Angeles under the care of her current doctors without risk of termination or loss of her health insurance benefits.  To the extent Plaintiff alleges that, absent an injunction, her financial condition will necessitate that she return to work — whether in Washington, D.C. or elsewhere — this claim simply restates her allegation that she will suffer irreparable harm as a result of her loss

of income.  As such, Plaintiff's claims of irreparably injury relate solely to her loss of income while she is on leave without pay status.

"It is [] well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674.  Loss of income, even for an indefinite period of time, does not generally afford a basis for a finding of irreparable injury.  *Sampson*, 415 U.S. at 89; *see also id.* at 91-92 ("loss of income . . . falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction").  This is true even if the plaintiff has insufficient savings.  *See id.* at 92, n. 68 ("an insufficiency of savings . . .  will not support a finding of irreparable injury, however severely [it] may affect a particular individual").  "To the contrary, given the court's equitable powers to remedy [] loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury."  *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 374 F. Supp. 2d 135, 142 (D.D.C. 2005) ("a loss of income does not constitute irreparable injury because the financial loss can be remedied with money damages"); *Nichols*, 18 F. Supp. 2d at 5 ("Merely asserting that one will lose his or her job and its attendant salary, without more, cannot possibly provide a sufficient basis for injunctive relief."); *Moore v. Summers*, 113 F. Supp. 2d 5, 24 (D.D.C. 2000) ("It is well-settled that preliminary injunctive relief is not usually available in employment cases because . . . 'it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" (quoting *Sampson*, 415 U.S. at 90)).

Although the Supreme Court recognized in *Sampson* that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the

employee, may so far depart from the normal situation that irreparable injury might be found," Plaintiff has not demonstrated that this is such an "extraordinary case." 415 U.S. at 92, n. 68. As an initial matter, Plaintiff in this case has not been terminated. Thus, unlike a discharged employee, she retains the ability to resume earning a salary if and when she believes she is able to return to work — either at PNN's D.C. office or at the offered position at the Central News Division in D.C. Similarly, unlike a terminated employee, Plaintiff retains access to her health benefits while she is on leave without pay status. Although some courts have found that irreparable harm may exist if an employee is able to demonstrate that, absent an injunction, she will lose access to health care benefits and critically needed medical treatment upon discharge, *cf. Penland v. Mabus*, 643 F. Supp. 2d 14, 22 (D.D.C. 2009) (denying injunctive relief where plaintiff did not demonstrate "that she would be denied access to critical medical care without injunctive relief") (citing cases), that is not the case at hand.[24]

Plaintiff's general assertion that she is "bankrupt although [she has] not filed for bankruptcy," Second Sataki Decl. ¶ 9, is also insufficient to demonstrate irreparable harm. As indicated above, the Supreme Court has made clear that a lack of savings, an "external factor[] common to most discharged employees and not attributable to any unusual actions relating to the discharge itself, will not support a finding of irreparable injury." *Sampson*, 415 U.S. at 92, n. 68.

---

[24] Plaintiff argues that, contrary to Defendants' present assertions, she will be required to reimburse the government for the full cost of her health insurance coverage for the period of time she is on LWOP status once she returns to work. *See* Pl.'s Supp. Resp. to Defs.' Supp. Surreply at 8. Plaintiff has offered no evidence in support of this assertion, and the evidence in the record indicates otherwise. Specifically, while Plaintiff is correct that she will eventually be required to pay her share of health insurance premiums owed while she is on LWOP once she returns to work for BBG, she will not be required to reimburse the government for its portion of her health insurance premiums paid during this period of time. *See* Second Grace Decl. ¶ 7

Although some courts have indicated that irreparable harm may nonetheless exist where an individual has shown that bankruptcy is both certain and imminent, Plaintiff's general allegations in this case fall well below the showing required to satisfy her burden on this point. *See, e.g., Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 248-49 (E.D.N.Y. 1998) (holding that "[i]rreparable injury along these lines can only be established by a clear demonstration that the plaintiff: (1) has little chance of securing future employment; (2) has no personal or family resources; (3) has no private unemployment insurance; (4) is unable to finance a loan privately; (5) is ineligible for public assistance; and (6) there are other 'compelling circumstances' weighing heavily in favor of interim relief"); *Hamlyn v. Rock Island County Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997) (noting that monetary loss may constitute irreparable injury if "(1) the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits; (2) the plaintiff would be unable to finance his lawsuit without the money he wishes to recover; (3) the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment; and (4) the nature of the plaintiffs' loss may make damages very difficult to calculate").

Here, Plaintiff has not demonstrated that she has no personal or family resources. Nor has Plaintiff shown that she is unable to obtain a private loan or funds through other alternative sources. For example, as Defendants note, Plaintiff could have sought to recover lost wages through the Federal Employees' Compensation Act, but declined to do so to preserve her present damage claims. *See* Defs.' Supp. Surreply at 3-4; Pl.'s Supp. Resp. to Defs.' Supp. Surreply at 9 (acknowledging she chose not to pursue workers' compensation benefits). Similarly, the record indicates that Plaintiff has a Thrift Savings Plan account, *see* Second Grace Decl. ¶ 7, from which

she could make withdrawals to assist her during the pendency of the administrative proceedings, a point that Plaintiff has not disputed.  *See* Defs.' Supp. Surreply at 4-5; *see generally* Pl.'s Supp. Resp. to Defs.' Supp. Surrreply.  In addition, according to Plaintiff's own admissions, she is fully capable of performing gainful activity so long as she remains in Los Angeles under her doctors' care.  Second Sataki Decl. ¶ 15.  Although Plaintiff alleges that she is unable to return to work in the Washington, D.C. office of PNN, she has not demonstrated that she is permanently unable to return to work and in fact argues that she is able to do so now if she is able to work remotely from Los Angeles.  Furthermore, Plaintiff has not argued, nor is there any support for the position, that she will be unable to receive full compensation for any alleged monetary losses at the conclusion of this lawsuit, in the event she is successful with her claims.  The federal government has sufficient resources to satisfy any monetary judgment, and there is no indication that any of the Individual Defendants are or will become financially insolvent.  Nor has Plaintiff asserted that her damages are of such a nature that any monetary loss will be difficult to calculate.

Put simply, Plaintiff's general claims of financial distress, absent specific evidence that she has exhausted all alternative sources of income and/or financial assistance, are insufficient to support a finding of irreparable harm on the present record.  For this reason alone, Plaintiff's Motion for a Preliminary Injunction may be denied.  *CityFed*, 58 F.3d at 747 (a finding of no irreparable injury alone is sufficient to deny a request for a preliminary injunction without the need to reach other factors).  Nonetheless, the Court shall turn to briefly consider the remaining factors in this case, which further counsel against issuance of the requested preliminary injunction.

b.      Plaintiff has not demonstrated a substantial likelihood of success.

Key to Plaintiff's request for a preliminary injunction, the Court finds that she is unlikely to succeed on her claim under the Rehabilitation Act, which claim forms the substantive basis for Plaintiff's request for an order mandating Defendants to authorize Plaintiff to work from Los Angeles during the pendency of any administrative or litigation proceedings and to pay Plaintiff any owed salary and benefits.  In particular, Plaintiff has maintained that her request to work from Los Angeles is a necessary accommodation for her alleged disabilities; thus, as framed by Plaintiff, her request for injunctive relief is largely premised on her Rehabilitation Act claim. Plaintiff is unlikely to succeed on this claim for two reasons.

Pursuant to the Rehabilitation Act, federal employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A) (incorporated into the Rehabilitation Act by 29 U.S.C. § 791(g)).  To ultimately succeed on her claim under the Rehabilitation Act, Plaintiff must show that she is disabled.  *Desmond v. Mukasey*, 530 F.3d 944, 952-53 (D.C. Cir. 2008). In this case, even accepting as true all statements contained in the medical documentation submitted by Plaintiff in support of her Motion for a Preliminary Injunction, Plaintiff cannot show that she is disabled.  First, as the Court previously observed in denying Plaintiff's request for a temporary restraining order, "[g]iven Plaintiff's assertion that she can successfully perform the functions of her job in Los Angeles (i.e., outside the allegedly negative atmosphere currently existing at the Washington, D.C. office of PNN), it is unlikely that Plaintiff can demonstrate that she is disabled under the Act."  *Sataki*, 2010 WL 2195799, at *9.  Precedent in this Circuit makes clear that an individual is not disabled under the Rehabilitation Act if "the impact of an

44

impairment can be eliminated by changing the address at which an individual works, [such] that [the] impairment is neither permanent nor long term." *Haynes v. Williams*, 392 F.3d 478, 483 (D.C. Cir. 2004); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 84-85 (D.D.C. 2009) (finding that plaintiff was not disabled where he indicated that he could successfully perform the duties of his job in another location); *Rand v. Geithner*, 609 F. Supp. 2d 97, 103-04 (D.D.C. 2009) (finding impairment that only limited plaintiff's ability to work in a specific location was not a disability within the meaning of the Rehabilitation Act); *cf. Battle v. Mineta*, 387 F. Supp. 2d 4, 9 (D.D.C. 2005) (rejecting claim that an individual was disabled where alleged disability prevented him from working only with a discrete group of former supervisors), *aff'd* 2006 WL 3093811 (D.C. Cir. 2006) (per curiam) (if "the impact of [plaintiff's] impairments could have been eliminated by assigning him to a different supervisor, he was not substantially limited").[25]

The Court is unpersuaded by Plaintiff's attempts to distinguish her situation from the Circuit case law cited above holding that a disability does not exist if the impairments may be eliminated by changing the Plaintiff's work location or supervisors. *See* Pl.'s Supp. Mem. at 9-11. Indeed, in an apparent attempt to distinguish her situation from the cases outlined above, Plaintiff has instead indicated an alternative reason to find that her Rehabilitation Act claim is without merit — namely, that she is not an "otherwise qualified individual." *See* 42 U.S.C. §

---

[25] Congress recently made significant changes to the Rehabilitation Act and the Americans with Disabilities Act effective January 1, 2009. *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008). The purpose of the amendments was in part to overturn various Supreme Court decisions that Congress viewed as impermissibly narrowing the broad scope of protection afforded under the American with Disabilities Act. *See id.* Plaintiff has not argued that the D.C. Circuit case law cited above is no longer good law in light of the ADA Amendments Act of 2008 nor has Plaintiff otherwise indicated that the amendments impact the Court's analysis of Plaintiff's claim under the Rehabilitation Act.

12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."). Plaintiff suggests in her supplemental pleadings that she is unable to perform her present job functions regardless of whether she is located in Washington, D.C. or Los Angeles, such that here, unlike as in *Nurriddin* or *Rand*, a change of location will not affect Plaintiff's ability (or rather inability) to perform her work. Specifically, Plaintiff contends that in this case, "[e]ven if Defendants agree to temporarily detail Ms. Sataki to the Los Angeles office of the VOA, her symptoms will not disappear." *Id.* at 11. Accordingly, Plaintiff urges that "until and unless Ms. Sataki fully recovers, [she] is ***substantially limited*** in her ability to perform her normal job functions ***whether or not*** she is located in Los Angeles or Washington, D.C. or any other office of VOA." *Id.* at 7 (emphasis added). Plaintiff's psychiatrist, Dr. Long, further concurs that Plaintiff is at present unable to perform her regular job duties even with the requested accommodation, opining that Plaintiff cannot now perform the functions of her job but may "in time, with continued treatment be able to be a full functioning individual in the work arena performing the same tasks she was before she was injured." Long Decl. ¶ 8. To the extent Plaintiff now argues that the above-cited D.C. Circuit case law does not apply to her because she is unable to perform the essential functions of her job even with the requested accommodation, Plaintiff's claims under the Rehabilitation Act fail for the separate reason that she is not an "otherwise qualified individual." *See Woodruff v. Peters*, 482 F. 3d 521, 527 (D.C. Cir. 2007); *see also* 42 U.S.C. § 12111(8).

Second, Plaintiff is unlikely to succeed in demonstrating that Defendants failed to reasonably accommodate her alleged disability. Section 501(b) of the Rehabilitation Act requires

"federal agencies to reasonably accommodate the disabilities of otherwise qualified employees unless doing so would cause an undue hardship to the agency." *Porter v. Jackson*, 668 F. Supp. 2d 22, 233 (D.D.C. 2009). A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). In order to determine the appropriate reasonable accommodation, the agency should "initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation," which "process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* § 1630.2(o)(3). "[A]n employer is not required to provide an employee that accommodation [s]he requests or prefers; the employer need only provide some reasonable accommodation." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (citations omitted). Nor is an employer "obligated to 'bump' another employee in order to create a vacancy for the disabled employee" or "create a new position for the disabled employee." *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1998); *see also McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, __ F.3d __, 2010 WL 2572866, *3 (D.C. Cir. June 29, 2010) (affirming that employee's request to be reassigned to a receptionist position was not reasonable accommodation under the Rehabilitation Act where there was no vacant, available receptionist position).

In this case, the record indicates that BBG has, as it should have, initiated an interactive process with Plaintiff to determine an appropriate reasonable accommodation. While Plaintiff has consistently insisted that the only acceptable solution is to permit her to work remotely from

Los Angeles, the evidence in the present record indicates that this request is neither a reasonable accommodation under Rehabilitation Act case law nor consistent with her own description of her present disabilities. For example, Plaintiff alleges that she simply seeks permission to, in effect, telecommute from Los Angeles. This characterization of the requested relief is overly simplistic and unsupported by the record. As indicated above, Plaintiff's responsibilities in her current position include reading news segments for the shows "News and Views" and "News Brief," which are both taped in Washington, D.C., as well as performing general assignments, which involves going into the field, conducting interviews, and creating "packages." Jackson Decl. ¶ 3. Given the absence of any full-time PNN employees or support staff in Los Angeles and the fact that PNN does not perform any on-air work in Los Angeles, *id.* ¶ 8, Plaintiff is likely unable to perform her present responsibilities relating to "News and Views" and "News Brief" from the VOA Office in Los Angeles, a fact Plaintiff has not disputed. Despite Plaintiff's claims to the contrary, she asks BBG to, in effect, accommodate her alleged disabilities by creating a new position, on either a temporary or permanent basis, that operates out of Los Angeles and that is devoted solely to creating independent packages. Plaintiff has not shown that this is a reasonable accommodation.

Plaintiff also contends that the requested accommodation is necessary because "[j]ust hearing the names of defendants sends chills down [her] spine and feelings of resentment, embarrassment, helplessness, and sadness overwhelm[] [her] to the point that [she] withdraw[s] from whatever activity [she is] engaged in," such that she "cannot perform the normal activities of life," including those "related to work." Third Sataki Decl. ¶ 13. In other words, Plaintiff cannot work near or with the Individual Defendants. Yet Plaintiff proposes doing just that, albeit from

48

Los Angeles. There is no evidence in the record that she would be able to perform her present job duties as an International Broadcaster for PNN — whether remotely from Los Angeles or elsewhere — without having any contact whatsoever with PNN management in Washington, D.C., as she appears to indicate is necessary. To the extent Plaintiff asserts that she should be permitted to perform her work for PNN from Los Angeles without having any communication or interaction with PNN management, such a requested accommodation is clearly unreasonable. For these reasons, Plaintiff has not shown a substantial likelihood of success on the merits of her Rehabilitation Claim, which underlies her request for assignment to the Los Angeles office of the VOA.

It is a closer question as to whether Plaintiff has demonstrated a substantial likelihood of success as to her administrative claims under Title VII. Without question, there are material disputes of fact between the parties as to whether the allegedly harassing and retaliatory conduct occurred as described by Plaintiff. Defendants argue, however, that even assuming Plaintiff is able to prove that the alleged incidents occurred, she will be unlikely to succeed on her claims based solely on the legal precedent in this Circuit. *See generally* Defs.' Opp'n to Pl.'s Mot. for Reconsideration, Docket No. [55]. Specifically, Defendants contend that: (1) Plaintiff is unlikely to overcome Defendants' affirmative defense with respect to Plaintiff's sexual harassment claims that BBG exercised reasonable care to prevent and correct promptly any harassing behavior and Plaintiff unreasonably failed to take advantage of such opportunities, *id.* at 6-10; (2) Plaintiff's allegations do not rise to the level necessary to establish that the conduct created a sexually hostile work environment, *id.* at 12-16; and (3) Plaintiff failed to timely consult an EEO investigator as to many of the allegations underlying her claim of retaliation and her remaining

allegations fail to establish retaliation as a matter of law, *id.* at 16-21. Plaintiff has wholly failed to respond to these specific arguments. Given that Defendants' legal arguments — which arguments are premised on the assumption that Plaintiff can prove the facts as she alleges and therefore do not depend upon resolution of the parties' factual disputes — are unrebutted on the present record, the Court finds that Plaintiff has failed to meet her burden of demonstrating a substantial likelihood of success on the merits of her Title VII claims.[26]

Moreover, even assuming that Plaintiff had shown that she was likely to succeed on her Title VII claims, Plaintiff's requested relief goes well beyond the relief that a complainant may typically be awarded in a Title VII action. Plaintiff has pointed to no case law or other legal authority indicating that a court has the authority to order a federal agency to detail an employee (either temporarily or permanently) to another state, where the agency has no vacant positions, in order to redress alleged discrimination, retaliation or harassment. Indeed, Plaintiff has not even argued as much, as she has consistently maintained that she is entitled to the requested relief — not because it is necessary to remedy any alleged Title VII violations — but because it is a reasonable accommodation for her alleged disabilities under the Rehabilitation Act.

Finally, although Plaintiff now argues that her constitutional claims, as asserted in her

---

[26]With respect to Plaintiff's allegations that Defendants have "threat[ened] Plaintiff with mutilation of her vaginal areas, severe bodily injury and death and smearing her name and reputation on pornographic internet websites," Am. Compl. at 11, Plaintiff has advised that she reported these activities to the Federal Bureau of Investigation ("FBI"), which is currently investigating her complaints. *See* First Sataki Decl. ¶ 42; Third Sataki Decl. ¶ 13. Such allegations are obviously of a serious and alarming nature. However, there is insufficient evidence on the record for the Court to conclude that Defendants are responsible for this alleged conduct. Accordingly, the Court finds that the proper course of action at this time is to permit the FBI to complete its investigation into the threats and take whatever legal actions it determines are appropriate.

Amended Complaint, are not relevant to the Court's consideration of her Motion for a Preliminary Injunction, the Court in an abundance of caution notes that Plaintiff's claims fail for the reasons previously set forth in the Court's June 1, 2010 Memorandum Opinion, which is fully incorporated herein. *See Sataki*, 2010 WL 2195799, at *11-12. First, to the extent Plaintiff's constitutional claims seek to challenge the alleged national origin and sex-based discrimination, hostile work environment, sexual harassment, and retaliation, her claims are preempted by Title VII. *Id.* at *11. Second, Plaintiff cannot succeed on her claim that Defendants infringed her right to free speech in violation of the First Amendment by retaliating against her for her personal political views, her criticism of VOA, and other unspecified speech made at VOA/PNN, Congress, and elsewhere, as the claim is barred by the Civil Service Reform Act ("CSRA"), which requires Plaintiff first exhaust her administrative remedies as a jurisdictional prerequisite to bringing suit. *Id.* at *12. Third and finally, Plaintiff cannot succeed on her claims for damages against BBG and the official-capacity Defendants to the extent that they are based on alleged violations of her constitutional rights as there is no damages remedy against federal agencies (or official capacity defendants) for alleged constitutional remedies. *Id.* Similarly, she is unlikely to succeed on her claims for monetary damages against the Individual Defendants in their individual capacities as courts have generally declined to recognize a *Bivens* claim for federal employees whose First Amendment rights have been violated by their superiors or who advance constitutional claims arising from wrongs covered by Title VII, the Privacy Act, and the Civil Service Reform Act. *Id.* Plaintiff has therefore failed to demonstrate a substantial likelihood of success as to the merits of her remaining claims as well.

c.    The public interest and harm to third parties counsel against interim injunctive relief.

The Supreme Court has emphasized the importance of granting the federal government "the widest possible latitude in the dispatch of its own affairs." *Sampson*, 415 U.S. at 83. Regardless of how Plaintiff's request for injunctive relief is framed, she asks this Court to intervene in an ongoing personnel dispute between an employee and the federal government and to impose her preferred resolution on the agency before the dispute has been conclusively resolved and long before it is ripe for judicial review. Given the particular circumstances of this case and the well established principle that courts should be reluctant to interfere "in the sensitive areas of federal employee relations," *Andrade v. Lerner*, 729 F.2d 1475, 1489-90 (D.C. Cir. 1984), the Court finds that these final factors also counsel against granting the requested relief at this time. Accordingly, Plaintiff's [11] Motion for a Preliminary Injunction shall be DENIED.

B.    *Reconsideration Of The Court's Previous Decision Denying Plaintiff's Motion For A Temporary Restraining Order Is Neither Appropriate Nor Warranted*

The Court turns finally to Plaintiff's Motion for Reconsideration of the Court's June 1, 2010 Memorandum Opinion and Order denying Plaintiff's request for a temporary restraining order. For the same reasons outlined above, the Court also finds that Plaintiff's Motion for Reconsideration must be denied as well. "'A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Ciralsky v. Cent. Intelligence Agency*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Quite clearly, there has been no intervening change of controlling law or discovery of new evidence nor is there a need to correct a clear error

or prevent manifest injustice. As Plaintiff has failed to demonstrate that she is entitled to the requested interim injunctive relief, the Court's decision denying her request for a temporary restraining order was not in error. Plaintiff's [41] Motion for Reconsideration shall therefore be DENIED.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's [11] Motion for a Preliminary Motion and her [41] Motion for Reconsideration are both DENIED. An appropriate Order accompanies this Memorandum Opinion.

Date: July 7, 2010

/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge