

# FREEDOM WATCH

▶ www.FreedomWatchUSA.org

**World Headquarters** 2000 Pennsylvania Avenue, N.W., Suite 345, Washington, DC 20006-1811 ▶ (310) 595-0800 ▶ leklayman@gmail.com

January 10, 2011

Clerk of the United States Court of Appeals
District of Columbia Circuit
333 Constitution Avenue, N.W, Room 5409,
Washington, D.C. 20001.

Re: <u>Disciplinary Complaint Against  Judge Colleen Kollar-Kotelly</u>

This is a complaint against the District Judge Colleen Kollar-Kotelly of the United States District Court for the District of Columbia, brought pursuant to Rules of the United States District Court for the District of Columbia, LCvR 40.10, and under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. § 372(c), which authorizes complaints against United States circuit, district, bankruptcy, and magistrate judges who have "engaged in conduct prejudicial to the effective, and expeditious administration of the business of the courts…" This complaint is further based on Judge Kollar-Kotelly's repeated violations of the Code of Judicial Conduct of the District of Columbia. Specifically, this complaint relates to Judge Kollar-Kotelly's judicial misconduct in the following three cases as well as her general misconduct:

1. Larry Klayman et al., v. Judicial Watch, Inc. et al, (06-Cv-00670);
2. Elham Sataki  v. Mehdi Falahati, et  al. (10-Cv-00466); and
3. Elham Sataki v.  Broadcasting Board of Governors, et al. (10-0534)

1

The undersigned respectfully requests that the actions of Judge Kollar-Kotelly be investigated and that she be removed from these cases and severely reprimanded by her peers.

The undersigned has continuously been and is a member in good standing of the District of Columbia Bar and the bar of this court.  I have been a practicing lawyer for nearly 34 years. I bring this complaint on my own behalf and on behalf of my clients, and in the interest of justice.

In 1994, after 17 years as a practicing trial lawyer, and a former U.S. Department of Justice prosecutor and defense attorney, I founded "Judicial Watch," because, over my years of practice, I had come to see that certain federal judges sometimes act and think as if they are "above the law."  Judge Kollar-Kotelly is regrettably an example of such a judge, who puts her own politics above the law and in fact ignores the facts and the law when it suits her own personal agenda.

In founding Judicial Watch, my mission was to create an organization that would police both the judiciary, and the legal profession as a whole.  With regard to judges, I saw this as a necessity because judges, generally, will not stand in judgment of other judges. They will not stand in judgment of the misconduct of their peers. Much like lawyers and other professionals, judges refuse to hold their own accountable. Regrettably, federal judges are chosen by the sitting President usually on the basis of their politics and political connections—patronage so to speak. And, because once confirmed they are judges for life, some regrettably act and think as if they are "above the law."

Judge Kollar-Kotelly has engaged in judicial misconduct in this way toward me and several of my clients over the years, but recently the situation has become much more acute and prejudicial in the above referenced cases.

In presiding over these cases, Judge Kollar-Kotelly engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts and acted in direct violation of the Judicial Canons of the Code of Judicial Conduct of the District of Columbia. In pertinent part, Canon 1 of the Code of Judicial Conduct of the District of Columbia provides as follows:

**"A JUDGE SHALL UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY"**

A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

As set forth below, Judge Kollar-Kotelly's decision-making and actions have harmed the integrity and independence of our judicial system. Judge Kollar-Kotelly's actions in the above three cases in particular have been colored and prejudiced by her extreme political dislike (if not outright hatred) of me and what I stand for.  Not only has Judge Kollar-Kotelly not acted to further the interests of justice as required in Canon 1, her actions have further caused a lack of confidence in the legal system, and her actions have harmed innocent third parties.

I am not the ordinary trial lawyer; far from it. During the 1990's I filed over eighty cases against Bill and Hillary Clinton and their administration. My work was instrumental in uncovering the famous Chinagate or campaign finance scandals. I also represented nearly all of the women who claimed to have been harassed and sexually abused by Bill Clinton, among other cases, such as the equally famous Filegate case and scandal. During this time, I developed a reputation (undeservedly) of being anti-Democratic Party; however, I was and I am a fierce thorn in the side of the liberal political establishment and all establishments which seek to protect and further their own interests at the expense of the people. This partisan reputation was undeserved because when George W. Bush became president, I treated his administration similarly in attempting to hold him and his vice president, Dick Cheney, to the rule of law. Nevertheless, I was demonized by the left in this country, particularly in Washington, D.C. I am a mix between conservative and libertarian in my political philosophy. But politics should not play a role in meting out the rule of law in any event.

It is a well known fact that when Judge Colleen Kollar-Kotelly was nominated by President Clinton for a seat on this court that her nomination was bitterly opposed by conservatives and their public interest groups, such as the late Paul Weyrich's Free Congress Foundation – which reviews and critiques the qualifications of federal judges -- because of her extreme left-wing views and extra-legal decisions on the bench. The Free Congress Foundation opposed the confirmation to the federal bench of Judge Kollar-Kotelly, because it found, after investigating her qualifications, that her ultra-left philosophy perverted her judicial rulings under the rule of law. It is also a known fact, and it is not coincidental, that Judge Kollar-Kotelly's husband, himself a lawyer, played a

role which was useful to President Clinton during the infamous Monica Lewinsky scandal, which resulted in the impeachment of Bill Clinton—only the second time in American history that impeachment had occurred. I not only worked with Congressman Bob Barr to introduce articles of impeachment against Bill Clinton, and assisted the House of Representatives in its subsequent impeachment proceedings, I was also very active during the Monica Lewinsky scandal representing many of the women – Jennifer Flowers, Paula Jones, Kathleen Willey, Juanita Broadrick, Dolly Kyle Browning – who corroborated Bill Clinton's sexual predilections, infidelity toward and abuse of women, including break-ins by private investigators into their homes, death threats, and IRS audits, to name just a few of the tactics employed by the Clintons to intimidate and scare these women from coming forward to testify. I appeared frequently on television to discuss my legal cases and representation in this regard. My family and I were also threatened during this period in American history, so much so that I had to retain security guards for my children, my then wife and myself.

By the end of the Clinton presidency, although the nation is quick to forget given universally recognized poor leadership in the White House since then, Bill and Hillary Clinton had racked up over 40 scandals, been accused of even murdering witnesses and White House Deputy Counsel Vince Foster, and left office in near total disgrace. Hillary Clinton even attempted to steal White House furniture as she left, but had to bring it back after a public outcry. In short, there was no crime that was beneath the Clintons. Bill Clinton was disbarred for 5 years by the Arkansas Bar, and the independent counsel, Robert Ray, stated publicly that he did not pursue criminal charges against Hillary Clinton for lying before a grand jury because it was unlikely that a District of Columbia

jury, given its racial and political makeup, would convict her. During this period, I was the only lawyer to have obtained a court ruling, which occurred in the Filegate case, finding that Bill Clinton had committed a crime when he publicly released the Privacy Act protected files of Kathleen Willey, a woman he has been accused of sexually harassing in the Oval Office.  So for all of these reasons, I am not a typical trial lawyer, but a very controversial one, who was, and is seen as a threat to Democrats and persons associated with Bill and Hillary Clinton. I recently had published a book, "Whores: Why and How I Came to Fight the Establishment," which is my autobiography. In this book, which was released in October 2009, I am critical of Judge Kollar-Kotelly, among other jurists and politicians and media figures.

The Clinton era was a dark period in this nation's history and the country became very polarized. I was, and still am, seen as a polarizing figure, because I challenge the legal and political establishment in court and in the media, and hold them accountable.

Some judges, like Judge Kollar-Kotelly, react negatively to this and have a hard time dealing with me. Canon 2 of the Code of Judicial Conduct of the District of Columbia provides that:

**A JUDGE SHALL AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL OF THE JUDGE'S ACTIVITIES**

A. A judge shall respect and comply with the law and shall act at all times **in a manner that promotes public confidence in the integrity and impartiality of the judiciary.**

B. A judge shall not allow family, social, **_political_** or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the

impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness. [Emphasis added.]

Comments to Canon 2 clearly state that "*The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.*" The details of Judge Kollar-Kotelly's actions as set forth herein would certainly lead a reasonable person to believe that Judge Kollar-Kotelly has a personal vendetta against me based on my politically charged legal activities during the Clinton administration and otherwise. Unfortunately, Judge Kollar-Kotelly has allowed this to pervert her decision-making and actions on the bench so much so that not only have my family and I been subjected to injustice, but more importantly, my clients have been unfairly harmed by the Judge's actions. As just one example of the legal precedent that is relevant here, federal district courts have held that a jurist can be disqualified and disciplined by her imputing extra-judicial bias and prejudice toward an attorney to the client. For instance, see Souder v. Owens-Corning Fiberglas Corp. 939 F. 2d 647, 653 (8th Cir. 1991); United States v. Sykes, 7 F. 3d 1331 (7th Cir. 1993);  United States v. Jacobs, 855 F. 2d 652, 656 (9th Cir. 1988); In re Beard, 811 F. 2d 818, 830 (4th Cir. 1987); United States v. Ritter, 540 F. 2d 459, 462 (10th Cir. 1976); Davis v. Board of Sch. Comm'rs, 517 F. 2d 1044, 1050-51 (5th Cir. 1975).

One of the most important elements of justice in our legal system is preserving the *appearance* of justice.  At times reassignment of a case or disqualification of a judge is necessary to preserve the appearance of justice. Case law has clearly held that where legal errors by a judge are so prevalent as to clearly establish a bias, the case must be

reassigned and the judge must be disqualified. Disciplinary action is even more necessary in such instances, particularly since judges will almost never disqualify themselves and historically the judiciary has protected its peers. Such is the case with Judge Kollar-Kotelly in the above referenced three cases.

The misconduct resulting from extra-judicial bias and prejudice of Judge Kollar-Kotelly toward my family and me, counsel in the above referenced cases, is most egregiously seen most clearly in Klayman v. Judicial Watch (06-cv-00670), a case brought by me to enforce my severance agreement with Judicial Watch when I left to run for the U.S. Senate in Florida.  In Klayman v. Judicial Watch, an on-going litigation, Judge Kollar-Kotelly allowed the Defendants, comprised of my former collegues, to take discovery into my divorce from my ex-wife, wherein she falsely accused me of marital infidelity (well before Judge Kollar-Kotelly ordered the discovery, the allegation had long since been retracted by my wife in a consent divorce decree). Nevertheless, Judge Kollar-Kotelly allowed an innocent woman, who never had an affair with me, and who has two children and is married, to have her name despicably and publically dragged through the mud. As a non-meritorious defense, Defendants had falsely alleged that I left Judicial Watch involuntarily over this "affair," characterizing Judicial Watch as a family oriented organization (ironically, the two current principal directors of Judicial Watch, Messrs. Fitton and Orfanedes, are not "typical" family values conservatives). Judge Kollar-Kotelly clearly ignored the blatant language of the severance agreement  which provides that I, "Mr. Klayman," had left voluntarily to pursue other endeavors (see Attachment #1 to Docket Item No. 14, 1:06-cv-00670), such as running for the U.S. Senate. Defendants signed and agreed that this was so in the severance agreement. Thus, Judge Kollar-

Kotelly allowed for an outrageous and irrelevant and not legally justified fishing expedition into my personal life – which harmed innocent third parties-- based on the false assertion by Defendants, belatedly in the context of this case, that had no factual or legal basis for consideration, even simply as a matter of the parol evidence rule.

Importantly, Judge Kollar-Kotelly's actions, which were cruel, and vindictive and retaliatory,  affect how my young children view their father (and how the innocent woman's children will view her), and serve as a dark reminder of the bridled and arrogant power of some on the federal bench who choose to use their power for improper ends.  This was obvious "payback" for representing the women who had come forward to testify against President Bill Clinton who had appointed Judge Kollar-Kotelly to the bench and to whom she owes her judgeship. It is obvious to any reasonable person that Judge Kollar-Kotelly, seeing an opportunity to try to harm and smear me and destroy my reputation and my relationship with my children, and to hamper me from bringing future lawsuits against her Democratic party and the left wing establishment, seized on the opportunity presented to her. When I asked, at a minimum, that this scurrilous and irrelevant discovery be sealed and kept off the public record, Judge Kollar-Kotelly even denied this request.   (See Judge Kotelly's Paperless Order of 07/31/2008, Judicial Watch Docket Item 213 in the Judicial Watch matter, 06-Cv-00670). The allegations predictably found their way into publications, like Legal Times. My additional request to enter a protective order to protect from public disclosure confidential business proprietary information, as is the usual course of conduct in cases dealing with business damages was similarly denied. (See Judicial Watch Docket Item 137 and related filings in the Judicial Watch matter, 06-Cv-00670). This too was ordered

and when I objected and would not put the business proprietary information on the public record, Judge Kollar-Kotelly dismissed most of my case and barred me from presenting evidence on damages. In addition, Judge Kollar-Kotelly also denied a one day or short extension of time during the Christmas-New Years holiday season in 2008 and instead proceeded to enter summary judgment against me in part because I could not file the pleadings that were required until a day later after the holiday. In a disingenuous opinion, she then stated falsely that she had reviewed the one day late filing in any event, and still was granting summary judgment – a clever judicial game. (See Docket Item 293 Stating "For the reasons set forth in this Order dated December 30, 2008, it is hereby ordered that Plaintiff's 287 motion for an extension of time is DENIED; and it is further ordered that Plaintiff's 291 Opposition and 292 Response to Defendants' Statement of Material Facts are hereby STRICKEN.   (Entered: 12/30/2008)").  After all of this and more, when I asked Judge Kollar-Kotelly to disqualify herself under 28 U.S.C. 455 from further proceedings, this too was denied. (See Judicial Watch Docket Item 345).

Canon 2(B) of the Code of Judicial Conduct of the District of Columbia provides that a "**judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment**. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others…" (Emphasis added). Judge Kollar-Kotelly's goal in attempting to destroy my family and me, and anyone allegedly associated with me (such as the innocent woman and her family) and her interest in the advancement of her own political agenda and protection of the Clintons – who had her appointed to the bench and for which she obviously feels she

10

thus owes a "return favor" -- are in direct conflict with the requirements of the Canon 2(B) of the Code of Judicial Conduct.

As another example, in one of the other cases at issue here, Sataki v. BBG et. al, (10-0534), Plaintiff and I requested reassignment of the case, in order to try to avoid having to file a motion under 28 U.S.C. 144, since it is regrettably clear that disqualification is rarely if ever ordered given the realities of our court system and the penchant of the judiciary to "circle the wagons" and protect its own.

Judge Kollar-Kotelly refused to reassign the case ignoring Canon 3 (E) of the Code of Judicial Conduct of the District of Columbia states:

 (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality **might** reasonably be questioned, including but not limited to instances where:

(a) **the judge has a personal bias or prejudice concerning a party or a party's lawyer**...

Reassignment was requested from Judge Kollar-Kotelly herself, or if she would not order reassignment, then through the chief judge—the Honorable Royce C. Lamberth. However, rather than timely entertaining the motion, Judge Kollar-Kotelly "hung back" and denied the motion on the same day that she refused and failed to grant Plaintiff's motion for preliminary injunctive relief – creating a "fait accompli" for my client and me.

Accordingly, when further acts of prejudice occurred in the case, and the situation became even more acute, I was then regrettably forced to file a motion under 28 U.S.C. 144. In pertinent part, 28 U.S.C. 144 clearly provides as follows:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, **such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.**
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. [Emphasis added.]

When a motion to disqualify is filed with an accompanying affidavit as was the case here, and the affidavit clearly sets forth facts evidencing extra-judicial bias and prejudice, the judge is to immediately remove herself from the case. [28 USC §144; United States v. Zagari, 419 F. Supp. 494, 499 (1976).]

Indeed, after I filed a motion under 28 U.S.C. 144, Judge Kollar-Kotelly should not -- having disobeyed the law and not removed herself from the case -- have ruled on her own extra-judicial bias and prejudice – as the resulting ruling was logically predetermined. However Judge Kollar-Kotelly did exactly that – predictably ignoring the grounds for her requested recusal and misconduct – which set forth in excruciating detail how she had intentionally misrepresented and misapplied the facts and the law.

(See Sataki Docket, item 66, Exhibit 2). Can anyone logically assume that this jurist in particular would have ruled against herself, particularly under the circumstances? The law makes it clear that the judge making the disqualification ruling, obviously another judge, must accept the facts set forth in the affidavit and cannot and should not go beyond them.  **The judge against whom an affidavit is filed under 28 USC §144 cannot pass on the truth or falsity of the facts stated in the affidavit. The judge must assume the alleged facts are true even if the judge knows them to be false**: "To commit to the judge a decision upon the truth of the facts gives chance for the evil against which the section is directed." [*See* Berger v. United States, 255 US 22, 36 (1921)]. This is so because 28 U.S.C. §144 was intended to in effect be a type of peremptory challenge and in fact it can only be used on a one-time per case basis.  28 U.S.C. §144 is clear on its face and in fact no harm would come to any party by reassigning the case to another jurist that the parties have confidence would and will mete out justice and as importantly the appearance of justice as required by Canon 2 of the Code of Judicial Conduct of the District of Columbia.

In short, the law is clear – when a sufficient affidavit and motion is filed, as is the case here -- the motion **must, by the letter of the statute,** be referred to another judge for determination of its merits. [28 USC §144; United States v. Sibla, 624 F.2d 864, 869(1980).] No evidentiary hearing is required, and the matter should be decided solely on the basis of the affidavits submitted. [United States v. Zagari, 419 F. Supp. 494, 499 (1976).] Upon the filing of a disqualifying affidavit under the statute the district judge must treat the matters alleged therein as true, without inquiry into their actual truth or falsity, and to retire from the case if the charge of personal bias or prejudice is

sufficiently supported by the facts stated. [*see* Am Jur., Judges (Rev. ed. §202); *see also* Berger v. United States, 255 US 22 (1921).]

Although the strict language of the statute requires that upon filing of the motion and affidavit the judge "**shall proceed no further therein, but another judge shall be assigned to hear such proceeding,**" Judge Kollar-Kotelly has nonetheless ignored the law and did what she wanted. This is judicial misconduct of the highest magnitude, particularly since the rights of a sexually harassed woman who simply wanted to be able to go back to work in the Los Angeles field office of Voice of America were compromised. (See Sataki Docket item 5 and 11.)

A motion pursuant to 28 U.S.C. 144, on its face, requires disqualification of a judge once a party files a timely and sufficient affidavit, as is occurring herein. Nevertheless, Judge Kotelly has ignored the clear letter of the law. (See Judge Kotelly's Order on Sataki's Motion to Disqualify, Sataki Docket Item 76 and 86.)   Again, this is because Section 144 was meant as a type of "peremptory" challenge to a judge sitting on a case or cases, as exists in many states, such as California. In the Sataki case, Judge Kollar-Kotelly committed several prejudicial acts. But in sum, this jurist not only ignored the law, she misrepresented the facts of the case to such an extent that it could not have been accidental. And, most egregiously, she refused to even allow for an evidentiary hearing or discovery, and weighed and accepted the affidavits of the agency over the affidavits of my client, Ms. Sataki, in denying her reasonable request for temporary relief that would have given her a source of income while she rehabilitated, since she had to remain in Los Angeles after she suffered a nervous and physical breakdown and was forced into a

14

suicidal state and had to consult her physicians, psychologists and psychiatrists there –
where she remains under their care. This conduct was so prejudicial to the fair and
impartial administration of justice that this judicial complaint is being filed against Judge
Colleen Kollar-Kotelly.

Ms. Sataki's right of legal appeal at the end of her case will not sufficiently remedy
the harm to her that Judge Kollar-Kottelly's lawless actions have caused. Nor will it serve
to protect the integrity of the judicial system and its mandated role in not only meting
out justice, but also the appearance of justice. Summarized below are just a few
examples of the obviously intentional factual and legal errors that are at issue, but which
Judge Kollar-Kotelly refused to correct even when asked to reconsider her "decisions."
(See for example, Judge Kotelly's extremely cursory, evasive and patently dishonest
"reasoning" – which ignores the factual and legal defects in her orders-- with regard to
Sataki's motion for reconsideration, Docket Item 86).

For example, in the Sataki v. BBG case, as set forth in the Memorandum Opinion of
July 7, 2010 denying Ms. Sataki's motion for preliminary injunction (See Sataki Docket
Item No. 63) and her Memorandum Opinion of June 1, 2010 denying Ms. Sataki's motion
for temporary restraining order (See Sataki Docket Item No. 37), Judge Koller-Kotelly
ruled in effect that government's affidavit testimony is entitled to more weight than an
ordinary citizen like Ms. Sataki, since it is the government, and then twisted and
misrepresented facts to suit her ends and "cook" the result. Referenced herein by Docket
Item Numbers are the various pleadings of Ms. Sataki which set forth the intentional and
chronic errors of Judge Kollar-Kotelly in not granting the temporary relief, which speak
for themselves.

As just a few examples, with regard to the July 7, 2010 Memorandum Opinion (See Sataki Docket Item No. 63), Judge Kollar-Kotelly twisted and misrepresented the facts and the law in ways which include but are not limited to:

1. Ruling falsely at page 3 that Ms. Sataki was attempting to alter the status quo, when she was simply just trying to get the court to order her to be put back to work and be paid for it, as was the case before the sexual harassment and retaliation;

2. Ruling, in a show of extreme arrogance and legal error toward the American people at page 4, much less employees of the federal government, that "well-established precedent further counsels that this Court should be reluctant to interfere with the personnel decisions of the federal government..." Were this the case,  a litigant who is sexually harassed and retaliated against could never prevail as a practical matter, despite established case law in this circuit that a federal district court can step in to prevent harm to the employee as her sexual harassment and related cases go through the administrative process. See Wagner v. Taylor, (836 F.2d 566 (C.A.D.C., 1987)).

3. Manufacturing facts (see page 6) falsely claiming that Ms. Sataki did not contest through affidavits her job duties and capabilities, and thus could not work in the Los Angeles VOA office without supervision and thus an evidentiary hearing is not necessary despite admitted contradictory facts submitted by the parties.

4. Holding falsely at page 7 that "Importantly, while Plaintiff's job duties occasionally require her to perform her work duties in the field, the record indicates that Plaintiff has always been assigned to the Washington, D.C., duty station; there is no indication that Plaintiff has been detailed to any other office location nor is there any evidence that she has been permitted to work remotely from another location for any extended period of time." This is false and Judge Kollar-Kotelly knew it is false when she based her ruling in large part on this. First, Ms. Sataki's sworn declarations (*See* Sataki v. BBG, et al., Attachment #2 to Docket Item 11, Civil Action No. 10-0534) set forth clearly that she worked out of other locations and did broadcast "packages" from there, including Los Angeles, and that she never asked to be detailed for "an extended period of time." She asked only to be detailed to Los Angeles while she undergoes rehabilitation. Thus, by falsely framing the issue the way the court did, with manufactured facts, Judge Kollar-Kotelly "cooked" the predetermined result she wanted to reach. This is the mark of a dishonest and prejudiced jurist who acts outside of the facts and the law when it suits her.

5. At footnote 4 on page 7, Judge Kollar-Kotelly, in what is the most blatant of her falsehoods in the Memorandum Opinion of July 7 2010, holds: "While Plaintiff disputes various statements contained in the Jackson Declaration, the Court emphasizes that she has not disputed the accuracy of her job duties provided in Ms. Jackson's declaration nor provided any evidence on the record that would create a material issue of fact as to Plaintiff's present job duties as an International Broadcaster." Not only did Ms. Sataki refute these false statements, made by a Defendant in the case (thus she has an interest in not truthfully testifying), but Ms.

In addition, Ms. Sataki swore that she could perform all job functions as an international broadcaster. (See Sataki Docket Item 44, Attachment 5) which states as follows:

"Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event." (Sataki Docket Item 44, Attachment 5¶ 17);

"I am independently capable of and proficient at researching interviewing, recording, editing, producing and submitting my work to the Washington, D.C. office of VOA, as the videos show. In fact, attached to my prior declarations, and this one, as exhibits, and are several of the "packages" I produced independently from Los Angeles and Sweden. I did many of these interviews without the use of a teleprompter or notes. I am capable of interviewing without aids, based on my memory and expertise." (Sataki Docket Item 44, Attachment 5 ¶18)

"A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office." (Sataki Docket Item 44, Attachment 5 ¶19)

"Susan Jackson herself wanted me to do packages from LA, as emails I previously filed with the court show. In these emails, Susan Jackson talks about my getting more training, which although I did not need, I got ...." (Sataki Docket Item 44, Attachment 5 ¶ 19)

"As stated in my earlier declarations, prior to the incidents leading to this lawsuit, PNN was in fact considering sending me to Los Angeles to prepare and report back with as many as five interview packages a month." (Sataki Docket Item 44, Attachment 5 ¶ 24)

See also Tim Shamble's Second Declaration , Sataki Docket Item 44, Attachment 4, ¶¶ 7-

8 stating as follows:

"Ms. Sataki's work has been rated by the Agency itself (via the annual performance review process) as satisfactory (we are on a two tier system so satisfactory is the highest rating).  If there were problems with her performance there no was no indication of them before she complained about being sexually harassed. In addition, when she first began to work for VOA, a few years ago, she was on a one year probationary period. If her work had not been good, she would neither been hired in the first place nor been approved for continued employment after her one year probationary period." (Sataki Docket Item 44, Attachment 4, ¶7.)

"I have been in close professional contact with Ms. Sataki and her supervisors and I never heard any of these supervisors say, orally or in writing, that she was not able to do packages on her own. This claim is recently manufactured." (Sataki Docket Item 44, Attachment 4, ¶8.)

In addition, Ms. Sataki submitted DVDs showing her competence in international broadcasting with her sworn declarations; and the court obviously did not review and instead ignored them.  In short, Judge Kollar-Kotelly creates, from whole cloth, the facts that she wants to avoid an evidentiary hearing and to rule summarily against my client -- who is on her medical and financial knees, and who just wants to work in the Los Angeles VOA office while she convalesces.

Further intentional errors in Judge Kollar-Kotelly's Opinion (See Sataki Docket Item 63) include but are not limited to:

1. It is false as ruled on page 15 (See Sataki Docket Item 63) that Plaintiff, Ms. Sataki, did not submit and offer to submit medical documentation about her medical condition. Indeed, the court references the uncontested medical reports of Dr. Arlene Aviera and Dr. James Long, who both set forth her medical disabilities and the reasons why she must remain in Los Angeles under their care during the period of her rehabilitation.

2. At page 18 (See Sataki Docket Item 63), Judge Kollar-Kotelly falsely states that Ms. Sataki is not receiving treatment from a physician authorized by BBG to handle workplace injuries. This was never a genuine issue in any of the material and so called evidence submitted by BBG to the court. And, Ms. Sataki, using her medical insurance coverage provided by BBG, used authorized and board certified psychologists and physicians such as Dr. Aviera an Dr. Long under this plan, which is Blue Cross/Blue Shield. In any event, this is an issue for an evidentiary hearing on the merits. By twisting and creating facts throughout, Judge Kollar-Kotelly not only denies Ms. Sataki due process, but cooks the result of her factually false and disingenuous decision, which reeks of extra-judicial bias and prejudice.

3. Attached to the Sataki Docket Item 66, the motion to disqualify, is an Exhibit which is a chart setting forth the other mischaracterizations, falsifications and perversion of the facts and the law contained in Judge Kollar-Kotelly's Memorandum Opinion of July 7, 2010 (See Sataki Docket Item 63). The multitudes of these "errors" could not have been "inadvertent," but the result of extra-judicial bias and prejudice of this jurist toward Ms. Sataki's counsel, which was then imputed to Ms. Sataki herself.

In addition to factual errors, Judge Kollar-Kotelly simply perverts the law. This is clearly contrary to the just administration of justice and the appearance of justice. (See Canon 1 and 2 of the Code of Judicial Conduct of the District of Columbia.) Set forth below is how Judge Kollar-Kotelly describes the legal standards for preliminary injunctive relief in cases where her political bent is in favor of the moving party, as opposed to in the Sataki case where it is not. See Memorandum Opinion of September

20, 2008, in Citizens for Responsibility and Ethics in Washington, et al. v. Richard B.

Cheney (Civil Action No. 08-1548 (CKK)) stating as follows:

> "In assessing whether to grant preliminary injunctive relief, a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. See Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citing CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In applying this four-factor standard, district courts employ a sliding scale under

which a particularly strong showing in one area can compensate for weakness in

another. (See City Fed Fin., 58 F.3d at 747.) As the Fourth Circuit stated in a case cited

approvingly by the D.C. Circuit:

> 'There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.'

Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus. Inc., 889 F.2d

524, 527 (4th Cir. 1989); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 366 (D.C.

Cir. 1999) (Citing Murrow Furniture Galleries with approval). Further, the D.C. Circuit

has ruled:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of the hardships tips decidedly toward plaintiff) it will ordinarily be enough that the plaintiff has raised substantial questions going to the merits

> so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 81, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). As such, "[o]ne moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (quoting *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973) (per curiam)). Significantly, the D.C. Circuit has concluded that "this approach is entirely consistent with the purpose of granting interim injunctive relief, whether by preliminary injunction or by stay pending appeal" because "such relief is [generally] preventative or protective; it seeks to maintain the status quo pending final determination on the merits of the suit." *Id.*; *see also Ramirez v. U.S. Customs and Border Prot.*, 477 F. Supp. 2d 150, 155, 159 (D.D.C. 2007) (granting preliminary injunction based on balancing of factors as set forth in *Holiday Tours*)."

See also the Memorandum Opinion of March 19, 2009, in Brady Campaign To Prevent Gun Violence, v. Kenneth L. Salazar Civil Action No. 08-2243 (CKK) wherein Judge Kotelly sets forth the legal standard very leniently, as follows:

> To obtain preliminary injunctive relief, a moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In applying this four-factored standard, district courts may employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. *Id.* Accordingly, "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Nevertheless, the D.C. Circuit has advised that a movant must demonstrate "'at least some injury' for a preliminary injunction to issue . . . [because] 'the basis of injunctive relief in federal courts has always been irreparable harm . . . .'" *Id.* (quoting *CityFed*, 58 F.3d at 747; *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).

Defendants raise an argument (albeit in a footnote) that this standard for a preliminary injunction has been circumscribed by the Supreme Court's decision in *Winter v. Natural. Res. Def. Council, Inc.*, __ U.S. __ , 129 S. Ct. 365 (2008). *See* Defs.' Opp'n at 11 n.8. *See also* MSLF Opp'n at 3 (discussing the application of *Winter*). The Court disagrees. In *Winter*, the Supreme Court held that the Court of Appeals for the Ninth Circuit had applied an erroneous legal standard by affirming a district court's preliminary injunction when the plaintiff had only shown a "possibility" of irreparable harm and where the district court had made almost no attempt to analyze the balance of equities and the public interest. *See* 129 S. Ct. at 375, 378.

The Supreme Court found that this standard was too "lenient," and reaffirmed that a preliminary injunction should issue only when "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). The Court had no occasion to examine the D.C. Circuit's precedents allowing a plaintiff's strong showing in one area to compensate for weakness in another. *Id.* at 392 (Ginsburg, J., Dissenting) ("courts have evaluated claims for equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high . . . This Court has never rejected that formulation, and I do not believe it does so today."). In any event, because the D.C. Circuit's precedents require a plaintiff to show that "it would suffer irreparable injury if the injunction were not granted," *Chaplaincy*, 454 F.3d. at 297, the Court finds that the D.C. Circuit's sliding-scale standard remains viable even in light of the decision in *Winter*."

In addition in her Memorandum Opinion of November 3, 2009, in Council on American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No. 09-2030  Judge Koller-Kotelly  uses a similarly low threshold (which she does <u>not</u> apply to Ms. Sataki) and issues a temporary restraining order to the Plaintiffs on an ex parte basis. In that case Judge Koller-Kotelly sets forth the legal standard, as follows:

The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established. A moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Hall v. Daschle, 599 F. Supp. 2d 1, 6 n. 2 (D.D.C. 2009) ( "[t]he same standard applies to both temporary restraining orders and

to preliminary injunctions"). In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another. Id. (quoting City Fed Fin. Corp. v. Off. of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)).

In the Sataki case, however, Judge Kollar-Kotelly, obviously colored by and because of her retaliatory vindictiveness for and toward counsel, "Mr. Klayman," she intentionally did **not** apply the same threshold as applied in the three cases cited above. Rather, in the Sataki case, Judge Koller-Kotelly intentionally and consciously misapplied her own legal standards, and dishonestly applied the following substantially heightened standard:

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 72-73 (D.D.C. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Daschle*, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

In applying this four-factor standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another area. *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed.*, 58 F.3d at 747. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. District of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant fails to do so, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied

on that ground alone. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir.1992) (affirming denial of preliminary injunction where the district court properly concluded that the plaintiff had "no likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation'"); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("Given the inadequacy of [plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). Applying these standards to the case at hand, the Court finds that Plaintiff has failed to demonstrate that she is entitled to a temporary restraining order on the present record. 12  [Foot Note 12: For this reason, the Court therefore declines to decide whether Plaintiff must meet an even higher burden of proof than outlined above because she is requesting mandatory injunctive relief — i.e., because she seeks to change the status quo through affirmative action rather than to merely preserve the status quo. *See* Defs.' Opp'n at 19 (urging Court to apply higher standard to Plaintiff's request for mandatory relief). This remains an open question in this Circuit. *See Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) (noting that the "D.C. Circuit . . . has not yet adopted or, for that matter, rejected th[e] rule" requiring a movant who seeks a mandatory injunction to meet a higher standard than in the ordinary case). While the Court agrees with Defendants that Plaintiff's request is properly characterized as seeking a mandatory injunction, the Court finds that Plaintiff has failed to show that the requested relief is warranted even under the ordinary standard set forth above. Similarly, although not raised by either party, the Court notes that some courts in this Circuit have also applied a higher standard to motions for preliminary injunctive relief in employment discrimination cases against the federal government. *See, e.g., Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) (holding that "a plaintiff seeking injunctive relief in a Title VII discrimination action against the federal government must make 'a more stringent showing of irreparable injury' and demonstrate that 'civil rights claims take precedence over the government's interest in making personnel decisions.'") (quoting *Bonds v. Heyman*, 950 F. Supp. 1201, 1212 (D.D.C. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). It appears, however, that the D.C. Circuit has yet to decisively resolve this issue. Accordingly, because the Court finds — as indicated above — that Plaintiff fails to meet the traditional showing required, it need not determine at this time whether a higher standard should apply for this reason as well.

In one of the cases where she applied a lower threshold, as set forth above in

Council on American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No.

09-2030, Judge Kollar-Kotelly even grants the moving party, CAIR, an ex parte temporary restraining order without sufficient notice to the Defendants, and held a hearing to boot. Importantly, Defendants were two authors who write for WorldNetDaily. I am a columnist for WorldNetDaily, a conservative internet publication that is seen by the left as an enemy.

Judge Kollar-Kotelly's insistence on ruling on the motion under 28 U.S.C. 144 on her own and not immediately allowing another judicial officer to take over or at the very least rule on the motion under 28 U.S.C. 144, as well as refusing to correct her manifest factual and legal errors, is also in clear violation of Canon 3 (B) of the Code of Judicial Conduct of the District of Columbia. Canon 3 (B) states:

> **(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.**
>
> (2) A judge shall be faithful to the law and maintain professional competence in it. **A judge shall not be swayed by partisan interests**…
>
> (3) A judge shall require order and decorum in proceedings before the judge.
>
> (4) **A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity**…
>
> **(5) A judge shall perform judicial duties without bias or prejudice.** A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice… [Emphasis added.]

Lastly, and most egregiously, was Judge Kollar-Kotelly's second most recent action of October 22, 2010 in the Sataki v. BBG matter.  On October 22, 2010, Judge Kotelly dismissed the entire case, including the primary seventh cause of action of Ms.

Sataki's complaint. (See Sataki Docket Items 77 and 78). In count VII of her complaint, the *Wagner Count,* Ms. Sataki had alleged that she is entitled to temporary and preliminary injunctive relief to have the court order her return to work during the pendency of an administrative proceeding under *Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) (the "*Wagner* Injunctive Relief claim"). Judge Kollar-Kotelly however, dismissed Ms. Sataki's case and the Wagner count, suggesting falsely that Ms. Sataki had voluntarily moved to dismiss all of the counts in the complaint and conceded dismissal of Count VII when Defendants had not even so moved. (See Sataki Docket Items 77 and 78).   This was not the case at all.   The evidence and the pleadings and the several motions and oppositions Ms. Sataki filed, made it abundantly clear that she did not voluntarily dismiss Count VII, or concede its dismissal, that she indeed wished to proceed to discovery and adjudication of the case on its merits and she did not concede Count VII of her complaint.   However, due to Judge Kollar- Kotelly's retaliatory vindictiveness toward Plaintiff and her counsel, Judge Kollar- Kotelly completely ignored this reality.   She completely made up inapplicable reasoning which is neither supported by law nor by the facts, in order to falsely and dishonestly "justify" her dismissal of Plaintiff's entire case.   Judge Kollar- Kotelly claimed, erroneously and intentionally, that because she had previously denied Ms. Sataki's preliminary injunction request under the *Wagner* count, and Ms. Sataki had been *required* to take appeal of that interlocutory order – which did not dispose of the entire case because by law it could not have done so – that Ms. Sataki had conceded her entire case and had no viable cause of action.   She thus improperly ignored her oath of office and entered judgment against her on the entire case without any basis in fact for law.   Judge Kollar-Kotelly ignored the fact that

Ms. Sataki did not appeal the Court's mere interlocutory order denying her request for preliminary relief because she intended to proceed to discovery pursuant to her prayer for permanent injunctive relief and that the reason she chose not appeal the preliminary injunction order was due to the delay and increased cost in term of time and expense any appeal would have caused to the final adjudication of her case on the merits.

Ms. Sataki had no obligation to seek appeal of what was only an interlocutory order and she rightly simply chose to move on with her case, conduct discovery – which was crucial since Judge Kollar-Kotelly had denied her discovery and any evidentiary hearing in the temporary relief proceedings but instead illegally weighed affidavits and improperly accepted in-toto the false affidavits of the Defendants while ignoring Ms. Sataki's. Ms Sataki had an absolute right to  proceed to the permanent injunctive relief phase of the case.

Even a first year law student would know that the law does not obligate or require Ms. Sataki to appeal an interlocutory order denying her motion for preliminary injunction in order to move forward, after discovery, with the permanent relief phase of her case. However, to prevent her from conducting discovery and due to her prejudice toward her counsel, Judge Kollar-Kotelly, simply ignored the valid bases of Ms. Sataki's motion to reconsider the dismissal of the case, very recently issuing on December 21, 2010, an order and an abbreviated memorandum opinion that did not even attempt to address the her serious factual and legal errors. [See Docket Item 87 entered December 21, 2010, in the Sataki matter.]

This behavior does not comport with the Canons of Judicial Conduct, which call for "high standards of conduct" and require that Judges "shall personally observe those

standards so that the integrity and independence of the judiciary will be preserved."
[See Canon 1 of the Judicial Canons.]  Judge Kollar-Kotelly's biased and illegal actions are
not fitting of a judicial officer who has taken an oath as follows:   "I, (Colleen Kollar-
Kotelly), do solemnly swear (or affirm) that I will administer justice without respect to
persons, and do equal right to the poor and to the rich, and that I will faithfully and
impartially discharge and perform all the duties incumbent upon me under the
Constitution and laws of the United States. So help me God."  Judge Kotelly has sworn to
uphold the law and treat each person in front of her court with dignity, equality and
fairness. Judge Kollar- Kotelly's has repeatedly violated her oath of office by ignoring the
facts and law in the above cases, instead taking extra-legal actions designed to carry out
what is in effect a vindictive reprisal against me and anyone associated with me.  I may
not be of Judge Kollar-Kotelly's political persuasion and have been a fierce advocate
against her party and the president who appointed her to the bench, but my client and I
deserve not be subjected to what amount to illegal acts of retaliation designed to harm
me, my family and my client representation.

     These matters cannot simply be rectified by filing appeals, which are very time
consuming and costly in any event. And, as is true in the Judicial Watch and Sataki cases,
much irreparable harm has already been done. I have had my reputation and the
family's unnecessarily smeared in the public domain – as well as the innocent woman
and her family – and Ms. Sataki, who has had a nervous breakdown from the sexual
harassment and retaliation of her government employer, and is not even being
permitted due process to show that she is entitled to return to work where she lives, Los

Angeles, during her period of rehabilitation. Judge Kollar-Kotelly has played a large role in destroying her emotionally and financially.

Judges are the nation's and the peoples' most important public servants. They are supposed to protect ordinary persons from the tyranny of other persons and entities and the other two branches of government. When, as in the cases concerning Ms. Sataki and me, a federal judge like Kollar-Kottelly intentionally ignores, miscites, misrepresents and intentionally misapplies the facts and the law to further her own vindictive and political agenda, then the judiciary itself is duty bound to step in and mete out the harshest of sanctions to preserve its integrity and to create at least the appearance of justice.

Judge Kollar-Kotelly must be sanctioned by removing her from the above cases forthwith. She should be severely reprimanded by her peers. The failure to do this will harm the judiciary and our system of "impartial and blind justice "as much as it has already harmed my client Ms. Sataki and me.

This nation is in a "revolutionary mode," because the judiciary and the rest of the government have in recent years generally failed to take into account the grievances of the people. The courts are the peoples' last line of defense and they must be restored to the vision of our Founding Fathers.  Judges like Kollar-Kotelly must, like the rest of society, be held accountable peacefully and legally for their judicial misconduct and lawless actions, quite apart from any appellate process, which carries no disciplinary or remedial consequence for federal judges – due to their lifetime tenure -- who fail to carry out their oath of office on behalf of the citizens who appear before and depend upon them for justice.

Thank you for your consideration, not just on behalf of Ms. Sataki and me, but also for yourselves and the important role judges are supposed to play in meting out not "just" justice, but as importantly the appearance of justice.

I respectfully request that the record of the cases at issue be examined very carefully, as the lawless and harmful actions of Judge Kollar-Kotelly are self evident and must be seriously addressed and remedied.

Respectfully submitted,

Larry Klayman ///
Larry Klayman, Esq. (DC Bar No.  334581)
Freedom Watch
Chairman and General Counsel
2000 Pennsylvania Avenue, N.W., Suite 345
Washington, D.C. 20006
Tel: 310-595-0800
Email – leklayman@yahoo.com

30